2015 JUL -6 AM 9: I.



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CEDAR GROVE COMPOSTING, INCORPORATED, | ) ) ) | No. 71052-4-I |
| | ) | DIVISION ONE |
| Respondent, | ) ) | PUBLISHED OPINION |
| v. | ) ) | |
| CITY OF MARYSVILLE, | ) ) | |
| Appellant. | ) ) | FILED: July 6, 2015 |
| | ) | |

LEACH, J. — In this appeal, we apply the Public Records Act (PRA)[1] to records prepared and held by a private third-party contractor who provided professional services to the city of Marysville (Marysville or City). The City appeals trial court decisions finding the City violated the PRA, imposing penalties, and awarding attorney fees and costs. The City claims that Cedar Grove Composting Inc. did not have standing to sue, that documents created by and in the possession of its private contractor were not public records subject to the PRA, and that the trial court abused its discretion in awarding penalties, attorney fees, and costs. Cedar Grove cross appeals the trial court's award of less than half of the fees it requested.

---

[1] Ch. 42.56 RCW.

Because Cedar Grove had a personal stake in the outcome of this action, it had standing to sue under the PRA. Under the exceptional facts of this case, the records prepared by a contractor acting as the functional equivalent of a city employee were public records for purposes of the PRA. Because the record establishes that Marysville violated the PRA by wrongfully withholding these and other public records, we affirm the trial court's PRA decisions. And because the court did not abuse its discretion in assessing penalties, striking Marysville's declarations or reducing Cedar Grove's fee request, we affirm the court's award of costs and attorney fees and denial of reconsideration.

## FACTS

In Maple Valley and Everett, Washington, Cedar Grove operates two of the largest commercial composting operations in Washington and among the largest in the United States. The Everett facility is just over half a mile from the city limits of Marysville. The City received a number of complaints about odors attributed to Cedar Grove. The Puget Sound Clean Air Agency (PSCAA) issued notices of violation and imposed fines against Cedar Grove, though the Pollution Control Hearings Board reduced some fines in 2011 after finding that Cedar Grove had made efforts in odor mitigation.[2]

---

[2] In its order, the board concluded that the PSCAA "erred by attributing such a large part of the combined penalty to the non-responsiveness of Cedar Grove" and reduced the penalties from $169,000 to $119,000.

Cedar Grove believed that a hostile public relations campaign was "spreading disinformation" about the company, particularly that Cedar Grove was the primary source of offensive odors in the Marysville area. A mailer, for example, encouraged residents to contact PSCAA if they "want to lodge an odor complaint—whether [they] believe it originates from Cedar Grove Composting in Everett or another industrial activity."[3] Cedar Grove learned that some of the mailers came from a mailing address and a printing company associated with a public relations firm, Strategies 360.

On November 1, 2011, Kris Cappel, of the Seabold Group, e-mailed a PRA request to Amy Hess, deputy clerk and public records officer for the City of Marysville.[4] Cappel requested documents including "any and all available information" about communications and professional services agreements "between or among" the City and Strategies, local citizen Mike Davis, the group "Citizens for a Smell Free Marysville," the Tulalip Tribes, media outlets, and a number of other parties. Cappel also requested records of communication "between or among" the City and other parties "relating or referring to Cedar Grove Composting, odor complaints, composting, permits or licensing."

---

[3] A PSCAA inspector told an attorney that the mailer, which residents received as a postcard and in a Parks and Recreation Department flier, "is designed to look like it comes from us but it does not" and that the PSCAA "[does] not solicit."

[4] The Seabold Group is an investigative and consulting firm. Cappel is an attorney not currently practicing law.

In her e-mail, Cappel did not identify Cedar Grove as a client or otherwise indicate her representative capacity. A November 2, 2011, e-mail among Strategies employees, however, indicates that Marysville Chief Administrative Officer Gloria Hirashima knew that Cappel made the requests on behalf of Cedar Grove. According to this e-mail, the day Cappel submitted the PRA request, Hirashima called Strategies Senior Vice President Al Aldrich to "give [Strategies] a heads up that after a quiet period, Cedar Grove has picked up their activity level. . . . [Hirashima] thought they might try to bootstrap a Records Request into our emails."[5] The record before us does not indicate that Hirashima spoke to Hess about Cedar Grove's interest in the records request or the phone call to Aldrich.

Hess's initial queries identified over 10,000 documents potentially responsive to Cappel's request. The City provided a first installment of "easily available" records on November 30, 2011, and a second installment on December 29, 2011. A portion of the documents produced were reproductions of Cedar Grove's own documents or documents from other agencies. These installments did not include responsive e-mail, which the City did not produce for several months.

---

[5] Aldrich noted in his e-mail that Strategies "did get bootstrapped into doing a Records Request a few years ago" in a lawsuit involving a different client.

On February 2, 2012, the City produced several e-mail messages between Kristin Dizon of Strategies and Grant Weed, Marysville city attorney. The City completely redacted the content of the e-mail, explaining in an exemption/redaction log that the redaction was for "Attorney Client Privilege/Work Product." The City produced additional installments of records on March 8, 2012, and April 5, 2012. Redaction logs for these installments claimed additional exemptions for "Attorney Client Privilege/Work Product."

In June 2012, Cappel asked Hess whether e-mail communications "to and among Strategies 360 representatives" had been "inadvertently redacted" under attorney-client privilege. Hess replied that the redacted e-mail were privileged:

> Strategies 360 was hired as a professional consultant to the City. The emails that are redacted are Work Product/Attorney Client communications between the City Attorney Grant K. Weed and the City Consultant and are legal advice, direction and input related to the project the City Consultant was working on for the City and within the scope of work product and attorney client privilege—the same as if the City Attorney were communicating with a City Staff member working on the project.

Two weeks later, Hess received a letter from a different attorney, Michael Moore, challenging the City's attorney-client privilege/work product claim. The letter requested that the City produce "all of the communications" by July 13, 2012, "[t]o avoid the costs of litigation and penalties for the improper withholding of the documents at issue."

On August 2, 2012, the City produced unredacted versions of the e-mail it withheld from the fifth installment, stating in a cover letter that it did not waive the attorney-client privilege or work product doctrine exemption beyond those specific records. In several of these e-mail, Dizon asked Weed to forward e-mailed information to Hirashima and Marysville Mayor Jon Nehring. Dizon explained in one e-mail that she was asking Weed to forward her e-mail, rather than sending it directly to Hirashima, "so it comes as privileged information from you," and said in a later e-mail, "I definitely do not want Cedar Grove to see the trail on this." Weed forwarded the e-mail as Dizon requested.

On August 28, 2012, Cedar Grove filed suit under the PRA. In September, Cedar Grove subpoenaed documents directly from Strategies 360. The subpoena sought "communications, emails, or other documents sent to, received from or exchanged between Strategies 360 and any third party (including the City of Marysville, the City of Seattle, the Tulalip Tribes, Mike Davis, Citizens for a Smell Free Marysville," among others, that "mention, reference, or relate" to Cedar Grove or the odor dispute. Comparison between Strategies' production and Marysville's earlier productions revealed 17 responsive e-mail between Marysville and Strategies that the City had not produced. The City also located two responsive e-mail on Mayor Nehring's

personal computer. The City later stipulated that it initially withheld these 19 records.

In November 2012, Cedar Grove moved for partial summary judgment, alleging that Marysville wrongfully withheld 22 responsive records[6] under an improper claim of attorney-client privilege. The City filed a response and cross motion for summary judgment. The summary judgment hearing occurred on April 19, 2013.

After noticing references in the City's productions to two particular types of document, Cedar Grove became concerned that Marysville and Strategies had not yet produced all responsive records. First, certain e-mail referred to Strategies' work with Mike Davis, leader of a local anti-Cedar Grove citizens' group, but records produced up to that time contained no information about the nature of that work. Also, Marysville had not produced any records related to mailers Strategies created, though several e-mail referred to this work. In June 2013, Cedar Grove moved to compel Strategies to produce additional documents related to "the Mailers and Strategies 360's work with Mike Davis."

On July 2, 2013, the court entered its order on cross motions for summary judgment, in which it found that the City had violated the PRA by withholding 15 e-mail under an improper claim of attorney-client privilege and work product. On

---

[6] In the verbatim report of proceedings (Oct. 3, 2013, hearing on fees), the attorney for Cedar Grove referred to 24 documents at issue at the April 2013 summary judgment hearing, but the court refers to only 22 in its order.

July 22, the parties stipulated that the City did not produce or disclose in an exemption log 19 more records responsive to Cappel's requests. And two days later, the court granted Cedar Grove's motion to compel, after which Strategies produced 173 responsive records, including 160 e-mail communications concerning Mike Davis and Strategies and 13 records relating to the mailers.

These e-mail indicate that Strategies worked closely with Davis and the City in the campaign against Cedar Grove. Strategies acted as a liaison between Marysville and Davis and relayed instructions to him for the City.[7] In one e-mail, Aldrich advised Davis to attend a city council meeting and "tell the Mayor, Gloria and Council that as citizens you really appreciate what they are doing. That should shore them up and keep them in the game, which is the biggest dynamic at work right now." Dizon also ghostwrote letters to the editor that Davis and others signed, wrote press releases, and prepared Davis with "talking points" for a radio interview.

Certain e-mail indicate that Marysville sometimes worked directly with Davis.[8] Other e-mail suggest that Strategies worked with the City, Davis, and

_____

[7] In a 2010 e-mail, Aldrich told Hirashima about attending a meeting of Davis's citizens' group: "I talked with Mike Davis afterwards, explained who I was and told him that Strategies 360 wanted to help them, with the City's blessing and paying us. He appreciated that and said he would call me next week to set up a meeting." The following day, Aldrich told Hirashima in another e-mail, "I'm having breakfast with Mike Davis on the 29th. Let me know if you want to discuss this further."

[8] City leaders took a letter on an environmental impact statement to a city council meeting at which Davis presented petitions from his citizens' group,

other third parties to circumvent the requirements of the PRA. Aldrich told Dizon and Davis that he was going to "tell Gloria by phone so it doesn't get caught up in [Cedar Grove]'s public records request." In a later e-mail, Aldrich told Tulalip Tribes members, "I will separately convey the [Cedar Grove] letter to Gloria and Jon at Marysville and have a phone discussion with them about the points above (their emails are all being reviewed by [Cedar Grove] under a Public Records request)." In another e-mail, Aldrich asked an attorney and Strategies staff, "[Mayor] Nehring's email below is his personal email, which should be separate from Open Records disclosures, right?" And Aldrich wrote Steve Gobin, a Tulalip Tribes member, an e-mail with the subject line "Cedar Grove" that informed Gobin that Aldrich had a sample of an anti-Cedar Grove mailer that would be sent to homes in Everett and Marysville. Aldrich told Gobin, "We are trying not to share the draft with Gloria and Marysville folks, primarily to give them 'plausible deniability' about the mailer and its contents."

Shortly after Strategies produced the 173 responsive records, Cedar Grove filed a motion for summary judgment for penalties. The trial court granted this motion on September 9, 2013, and imposed penalties of $70 a day for the 15 records improperly withheld as privileged, $40 a day for the 19 stipulation

which Dizon called "a [n]ice two for one punch." Davis referred in e-mail to a meeting with Hirashima and Nehring and to documents related to grants which were "started by [Davis] and finished by Gloria at Marysville."

records, and $90 a day for the 173 Strategies records. The penalties against the City totaled $143,740.

The City moved for reconsideration. On October 30, 2013, the trial court entered three orders: a revised order granting summary judgment to Cedar Grove regarding penalties, an order granting costs and attorney fees to Cedar Grove, and an order denying the City's motion for reconsideration. The court also struck three declarations the City submitted in support of its motion for reconsideration. The court awarded $127,644.83 for costs and attorney fees, less than half of the roughly $283,000.00 Cedar Grove sought.

The City appeals. Cedar Grove cross appeals the court's award of fees and costs.

## ANALYSIS

In 1972, Washington voters overwhelmingly approved Initiative 276,[9] a strongly worded mandate for public disclosure.[10] This initiative declared a broad public policy of disclosure that included the following elements:

---

[9] Voters passed this initiative by a margin of 72.02 percent (959,143 in favor) to 27.98 percent (372,693 against). http://www.sos.wa.gov/elections /initiatives/statistics_initiatives.aspx In addition to provisions for disclosure of public records, the initiative included provisions on campaign finance and created a public disclosure commission. In 2005, the legislature recodified the initiative provisions pertaining to public records as the Public Records Act, chapter 42.56 RCW. LAWS of 2005, ch. 274.

[10] Hearst Corp. v. Hoppe, 90 Wn.2d 123, 127, 580 P.2d 246 (1978).

(2) That the people have the right to expect from their elected representatives at all levels of government the utmost of integrity, honesty, and fairness in their dealings.

. . . .

(5) That public confidence in government at all levels is essential and must be promoted by all possible means.

(6) That public confidence in government at all levels can best be sustained by assuring the people of the impartiality and honesty of the officials in all public transactions and decisions.[11]

This policy also requires that courts liberally construe the PRA in favor of disclosure.[12] While these declarations of policy do not have any independent operative effect, they "serve as an important guide in determining the intended effect of the operative sections" of the PRA.[13]

Upon request, every government agency must produce for inspection and copying any public record unless it falls within a specific, enumerated exemption.[14] The act provides for judicial review to challenge an agency's withholding of a public record "[u]pon the motion of any person having been denied an opportunity to inspect or copy a public record by an agency."[15] This court reviews agency actions under the PRA de novo.[16]

---

[11] RCW 42.17A.001 (2), (5), (6).

[12] RCW 42.56.030.

[13] Hearst Corp., 90 Wn.2d at 128.

[14] RCW 42.56.070(1); Sanders v. State, 169 Wn.2d 827, 836, 240 P.3d 120 (2010).

[15] RCW 42.56.550(1).

[16] RCW 42.56.550(3); Neigh. Alliance of Spokane County v. Spokane County, 172 Wn.2d 702, 715, 261 P.3d 119 (2011).

Standing

As a threshold matter, Marysville contends that Cedar Grove lacks standing to sue under the PRA because it did not make the requests at issue. A nonparty, Cappel, made them. We rejected a similar argument in Kleven v. City of Des Moines.[17] In Kleven, a city argued that because Kleven's attorney made the contested records requests, Kleven lacked standing.[18] This court concluded that the city of Des Moines read the statute "too narrowly, contrary to the stated purpose of the [act]."[19] We observed, "The doctrine of standing requires that a claimant must have a personal stake in the outcome of a case in order to bring suit," concluding that the record "amply support[ed] Kleven's personal stake" in the requested records.[20]

Marysville unpersuasively attempts to distinguish Kleven. It asserts that "the attorney disclosed that the request was made on the client's behalf." But Marysville misstates the case's facts. In Kleven, the same attorney who submitted his client's public records requests later filed the lawsuit, and "[t]he petition commencing this case, which [the attorney] signed, clearly alleges that [he] made the requests for records on behalf of Kleven."[21] But the challenged

---

[17] 111 Wn. App. 284, 44 P.3d 887 (2002).
[18] Kleven, 111 Wn. App. at 290.
[19] Kleven, 111 Wn. App. at 290. At issue in Kleven was the Public Disclosure Act (PDA), chapter 42.17 RCW, which was renamed the PRA and recodified as chapter 42.56 RCW.
[20] Kleven, 111 Wn. App. at 290.
[21] Kleven, 111 Wn. App. at 290.

PDA requests, made by Kleven's attorney, did not disclose his representative capacity or his client:   "[n]either [this] request nor any communication that followed mentioned Kleven."[22]   Holding that Kleven nonetheless had standing, this court emphasized that it "will not read into the act a requirement that counsel must identify the fact of representation or the name of the client when making a request for public records on behalf of a client."[23]

The City also cites McDonnell v. United States[24] and other federal cases decided under the Freedom of Information Act (FOIA)[25] to argue that only a records requester has standing to sue.  But in Kleven, this court also rejected this argument.  Observing that "the FOIA provisions underlying McDonnell differ from the PDA provisions at issue here,"[26] the court concluded, "For this reason alone, FOIA does not provide any useful guidance in applying the PDA."[27]

The City points to WAC 44-14-030(4)[28] to argue that "Washington law is now akin to FOIA in regard to the precision by which the request must be made,"

---

[22] Kleven, 111 Wn. App. at 288.
[23] Kleven, 111 Wn. App. at 291.
[24] 4 F.3d 1227 (3d Cir. 1993).
[25] 5 U.S.C. § 552 (1970).
[26] Kleven, 111 Wn. App. at 292.  For example, in McDonnell, the Third Circuit noted that FOIA "'conditions the agency's duty upon receipt of a request that is made in accordance with published rules'" and reasoned that "'a person whose name does not appear on a request for records has not made a formal request for documents within the meaning of the statute'" and thus may not sue "'because he has not administratively asserted a right to receive them in the first place.'" Kleven, 111 Wn. App. at 291-92 (quoting McDonnell, 4 F.3d at 1236-37).
[27] Kleven, 111 Wn. App. at 293.
[28] WAC 44-14-030 provides in pertinent part:

noting that "the name of the requestor is <u>required</u>." But this model rule aims to facilitate communication between the agency and the person making the request, something not at issue in this case. It does not prescribe rules for standing to bring a lawsuit.

Finally, citing <u>Burt v. Department of Corrections</u>,[29] the City claims that CR 19 makes a person requesting records an indispensable party to a PRA lawsuit. We disagree. In <u>Burt</u>, Department of Corrections (DOC) employees filed suit against DOC to enjoin the release of records an inmate had requested, basing their claim on privacy.[30] The trial court denied the inmate's motion to intervene, and the inmate never participated in the lawsuit.[31] After DOC filed a memorandum in support of the requested protective order, the trial court permanently enjoined the release of the records.[32] Our Supreme Court noted

---

**(4) Making a request for public records.**
(a) Any person wishing to inspect or copy public records of the (name of agency) should make the request in writing on the (name of agency's) request form, or by letter, fax, or e-mail addressed to the public records officer and including the following information:
• Name of requestor;
• Address of requestor;
• Other contact information, including telephone number and any e-mail address;
• Identification of the public records adequate for the public records officer or designee to locate the records; and
• The date and time of day of the request.
[29] 168 Wn.2d 828, 231 P.3d 191 (2010).
[30] <u>Burt</u>, 168 Wn.2d at 830.
[31] <u>Burt</u>, 168 Wn.2d at 830-31.
[32] <u>Burt</u>, 168 Wn.2d at 830.

that "because of the parties' employee/employer relationship, no party was in a position to zealously advocate for the release of the records, which made for a proceeding that was not truly adversarial."[33] By excluding the requester—the person with a personal stake in the action—the trial court frustrated the PRA's purpose of protecting the public's interest in access to public records.[34] For that reason, the court vacated the injunction and remanded with instructions to join the inmate as a necessary party.[35]

Here, by contrast, the party with a personal stake in the action, Cedar Grove, filed the lawsuit. Cappel's absence does not create the danger of a proceeding that is not "truly adversarial." In Burt, the inmate was a necessary party not because he was the requester but because he had the only adverse personal stake in the litigation. He would have had no less of an interest in the action had an agent made the PRA requests for him—a scenario the court did not address. Burt does not support the City's position. We hold that Cedar Grove had standing to sue.

## 15 Records: Improper Claim of Exemption for Attorney-Client Privilege

The City challenges the imposition of PRA penalties for 15 e-mail records withheld under an improper claim of attorney-client privilege. Marysville contends that its ultimate production of these records before litigation precludes

---

[33] Burt, 168 Wn.2d at 835.
[34] Burt, 168 Wn.2d at 835.
[35] Burt, 168 Wn.2d at 838.

the trial court's imposition of penalties. The City does not dispute that the records were not privileged, as it previously claimed. Rather, it argues that because it "corrected any error it might have made" in asserting the privilege before Cedar Grove filed suit, the trial court erred in assessing penalties, "particularly for the excessive amount imposed at $70 per day."

We disagree. Our Supreme Court has held that "once a trial court finds an agency violated the PRA, daily penalties are mandatory."[36] In Neighborhood Alliance of Spokane County v. Spokane County,[37] the court held that "'[s]ubsequent events do not affect the wrongfulness of the agency's initial action to withhold the records if the records were wrongfully withheld at that time'"[38] and that "the remedial provisions of the PRA are triggered when an agency fails to properly disclose and produce records, and any intervening disclosure serves only to stop the clock on daily penalties, rather than to eviscerate the remedial provisions altogether."[39] Thus, the City's eventual production of unredacted versions of the 15 e-mail reduced the number of days for which penalties could be assessed and may affect the court's decision about the daily penalty amount.

---

[36] Neigh. Alliance, 172 Wn.2d at 726.

[37] 172 Wn.2d 702, 261 P.3d 119 (2011).

[38] Neigh. Alliance, 172 Wn.2d at 726 (quoting Spokane Research & Defense Fund v. City of Spokane, 155 Wn.2d 89, 103-04, 117 P.3d 1117 (2005)).

[39] Neigh. Alliance, 172 Wn.2d at 727.

But it would not "relieve an agency of its statutory duties, nor diminish the statutory remedies allowed if the agency fails to fulfill those duties."[40]

At oral argument, Marysville cited a recent case from Division Two of this court, Hobbs v. Washington State Auditor's Office,[41] for the rule that an agency's denial of records is a "necessary predicate" of a cause of action under RCW 42.56.550. Thus, Cedar Grove had no cause of action as to the 15 records. But the facts in Hobbs differ. There, the agency advised Hobbs that it would produce the requested documents in installments.[42] Hobbs filed suit immediately after the agency produced its first installment, while the request was still open and the agency was still gathering records.[43] He complained mainly about redactions, all of which the superior court later found to comply with the PRA.[44] Division Two affirmed the dismissal of Hobbs's case:

> When an agency diligently makes every reasonable effort to comply with a requester's public records request, and the agency has fully remedied any alleged violation of the PRA at the time the requester has a cause of action (i.e., when the agency has taken final action and denied the requested records), there is no violation entitling the requester to penalties or fees.[45]

Here, unlike in Hobbs, the requester's first response to the City's production was not to file suit but to inquire of the City whether it had

---

[40] Neigh. Alliance, 172 Wn.2d at 727.
[41] 183 Wn. App. 925, 335 P.3d 1004 (2014).
[42] Hobbs, 183 Wn. App. at 929.
[43] Hobbs, 183 Wn. App. at 932.
[44] Hobbs, 183 Wn. App. at 932.
[45] Hobbs, 183 Wn. App. at 940-41.

"inadvertently" redacted the records under an inappropriate claim of attorney-client privilege. The City then responded by reiterating its claim of exemption, thus denying the request. This constituted "final agency action" under RCW 42.56.520. Marysville violated the PRA by improperly claiming the attorney-client privilege exemption, and penalties are appropriate even though the City later produced the unredacted e-mail. No PRA provision or case law supports the City's claim that its prelitigation production of the 15 records somehow insulates it from all PRA penalties.

19 Records: Stipulation

The trial court also ruled that Marysville violated the PRA by withholding "19 records that Marysville's search should have located but did not and that Marysville has stipulated were public records not produced to Cedar Grove." Marysville argues that "questions of fact preclude a finding of liability under the PRA for almost all of the 19 documents" and that in any case, the documents are "inconsequential" and "certainly provide no basis for a penalty of $40 a day."

In the July 22, 2013, stipulation, Marysville agreed that the 19 responsive records listed "were not released by either being produced to Cedar Grove or disclosed in an exemption log" and that "the briefing and argument for the hearing regarding assessment of penalties will address, among other things, the 19 documents listed above." A stipulation signed by the parties' attorneys is a

contract, and contract principles govern its construction.[46]  Marysville cites no authority in support of its claim that this court should now set aside this agreement.  We affirm the trial court's ruling that Marysville violated the PRA by withholding the 19 records.

<u>173 Strategies Documents Created by Strategies and "Used" by Marysville</u>

Marysville challenges the trial court's decision that 173 documents created by Strategies and never possessed by Marysville are public records.  The trial court found the records to be public records for two reasons.  First, because of the intertwined relationship of Marysville and Strategies in which Strategies acted as the functional equivalent of a city employee, the records created by Strategies while acting as this functional equivalent were public records.  Second, Marysville used the 173 records because Strategies created these documents for and applied them to a governmental purpose identified by Marysville, resolving odor issues allegedly caused by Cedar Grove.  Marysville contends that the court's first reason reflects a misapplication of the law and that the second is not supported by the factual record.  It describes the court's decision as "a <u>massive</u> expansion of the PRA far beyond the specific contours of the Act."

Marysville contends that because Strategies is not a "public agency,"[47] the PRA does not apply to its records.  This argument misses the issue.  The trial

---

[46] <u>Allstot v. Edwards</u>, 114 Wn. App. 625, 636-37, 60 P.3d 601 (2002).

[47] RCW 42.56.010(1) defines "agency" as including "every state office, department, division, bureau, board, commission, or other state agency" or

court did not rule that the 173 documents were public records because Strategies was a public agency. It ruled that because, as Marysville itself acknowledged when claiming the attorney-client privilege, Strategies acted as the functional equivalent of a Marysville employee, the documents that Strategies generated in that capacity pertaining to the conduct of government were public records subject to the PRA.

The PRA defines a "public record" as "any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics."[48] This definition does not limit the term to documents prepared by government officials. Courts have construed it as referring to "'nearly any conceivable government record related to the conduct of government.'"[49] Public records may include records of a for-profit corporation acting as the functional equivalent of a public agency.[50]

The City contends that the court's decision "conflates the two concepts" of attorney-client privilege and a public record and forces governments to make a

"every county, city, town, municipal corporation, quasi-municipal corporation, or special purpose district, or any office, department, division, bureau, board, commission, or agency thereof, or other local public agency."
    [48] RCW 42.56.010(3).
    [49] Nissen v. Pierce County, 183 Wn. App. 581, 590, 333 P.3d 577 (2014) (quoting O'Neill v. City of Shoreline, 170 Wn.2d 138, 147, 240 P.3d 1149 (2010)), review granted, 182 Wn.2d 1008 (2015).
    [50] Clarke v. Tri-Cities Animal Care & Control Ctr., 144 Wn. App. 185, 194-95, 181 P.3d 881 (2008).

"Hobbesian choice": assert attorney-client privilege and risk PRA penalties or waive privilege and lose its protection. Marysville characterizes the trial court's ruling as concluding that because the City asserted that Strategies was the functional equivalent of an employee for purposes of attorney-client privilege, "this acted as the functional equivalent of an admission that all other Strategies' documents were therefore public records, including the 173 documents not sent to the City." According to Marysville, the trial court decision has a "pernicious" effect, resulting in a situation where "[v]irtually all records of government contractors potentially now become public records, even if the records were never sent to, or used by, the government. This is a distortion of the PRA and an unprecedented expansion of its scope." Similarly, amicus curiae Washington State Association of Municipal Attorneys (WSAMA) contends the trial court's decision "would bring all documents generated by a government contractor working on a government contract within the scope of the PRA" and "open the floodgates of public records liability for Washington's cities."

But Marysville and WSAMA overstate the trial court's ruling. The trial court did not rule that all records of government contractors are public records. Instead, the court applied Washington precedent holding that a private entity acting as the functional equivalent of a public agency is subject to the PRA to an analogous situation: a private company acting as the functional equivalent of a

-21-

public employee.[51] As noted by Division Three of this court, a local government may delegate performance of a public function to a private entity, but it cannot avoid its statutory responsibility to perform its PRA obligations through this delegation.[52] Otherwise, a local government could "contravene the intent of the PDA and the public records act by contracting with private entities to perform core government functions."[53] Similarly, a local government could thwart the intent of the PDA and the PRA by contracting with a private entity to perform its employees' work. For this reason, the PRA should apply to those records created by a private entity performing as the functional equivalent of a public employee in the same manner it applies to the records such an entity creates performing as the functional equivalent of a public agency. Otherwise, a local government could by piecemeal contracts avoid its PRA obligations.

In Telford v. Thurston County Board of Commissioners,[54] Division Two of this court adopted a four-factor functional equivalent balancing test to determine if an entity should be treated as a public agency for PRA purposes: (1) the extent the entity performed a governmental function, (2) the extent public funds paid for the activity, (3) the extent of government involvement or regulation, and (4) if the government created the entity. A balancing of these factors rather than

---

[51] Clarke, 144 Wn. App. at 194-95; Telford v. Thurston County Bd. of Comm'rs, 95 Wn. App. 149, 161-63, 974 P.2d 886 (1999).
[52] Clarke, 144 Wn. App. at 194.
[53] Clarke, 144 Wn. App. at 194.
[54] 95 Wn. App. 149, 162, 974 P.2d 886 (1999).

a satisfaction of all four determines if the entity is the functional equivalent of a state or local agency.[55] We apply an analogous test here.

Marysville necessarily conceded that Strategies was performing a governmental function when the City represented and the court accepted for purposes of asserting an attorney-client privilege its claim that Strategies acted as the functional equivalent of a city employee. Marysville makes no claim that a city employee would do work that was not performance of a government function.

Marysville cites no authority to support its assertion that a government may claim that a contractor is the functional equivalent of an employee in order to assert attorney-client privilege, while simultaneously claiming that documents generated by these de facto employees in the scope of their de facto public employment are not public records for purposes of the PRA. Marysville's unsupported statement that attorney-client privilege is "necessarily broad," while "[t]he definition of a public record is necessarily narrower," does not persuasively distinguish these two consequences—one a privilege and the other a responsibility—that flow from Strategies' status as the functional equivalent of a city employee.

Marysville paid Strategies for at least the majority of the work at issue. The trial court found, and the record shows, that Marysville was heavily involved

---

[55] Telford, 95 Wn. App. at 162.

in the work performed by Strategies. Strategies took a number of significant actions after direct consultation with Marysville or at Marysville's direction. Strategies and Marysville appear to have taken conscious steps to have records created by Strategies rather than Marysville with the express goal of avoiding the PRA.

Although the fourth factor is not satisfied, a balancing of all four factors leads to the conclusion that Strategies acted as the functional equivalent of a public employee performing a governmental function. Its activities served a public function, were paid in large part with public funds, and were directed and approved by Marysville. The evidence before the trial court shows that city officials and employees repeatedly took affirmative steps to avoid creating records they would normally create during the course of their work. Members of city government, together with Strategies personnel, pursued a deliberate policy to conceal the City's role in the campaign against Cedar Grove. They accomplished this by directing and delegating activities to Strategies and then disavowing knowledge of those activities, with the express object of avoiding the reach of the PRA.

Given the purposes of the PRA and Initiative 276, the trial court correctly determined that the records created by Strategies while performing these functions were public records. In response to Marysville's floodgate argument,

-24-

we emphasize that Strategies records not relating to its actions as the functional equivalent of a city employee are not subject to PRA requests.[56]

Marysville also argues that the 173 Strategies documents were not public records because the City did not "use" them. Our decision does not require us to address this argument. We nonetheless conclude that Washington case law supports the trial court's ruling that Marysville "used" the records in the meaning of the PRA.

In Concerned Ratepayers Ass'n v. Public Utility District No. 1 of Clark County,[57] our Supreme Court held that an agency "uses" information for purposes of the PRA when the information is "applied to a given purpose or instrumental to [a governmental] end or process" and where "a nexus exists between the information and an agency's decision-making process." In Concerned Ratepayers, citizens requested a document describing technical specifications of a turbine generator that the public utility district (PUD) was considering for a proposed power plant.[58] The PUD argued that the document was not a public record because the PUD never possessed or used it and ultimately chose to install a different generator model.[59] The court concluded,

---

[56] See Nissen, 183 Wn. App. at 592-93.

[57] 138 Wn.2d 950, 952, 983 P.2d 635 (1999).

[58] Concerned Ratepayers, 138 Wn.2d at 952-53. The citizens who formed the Concerned Ratepayers Ass'n sought to determine if the proposed power plant would be capable of generating more than 250 megawatts of power, thus necessitating a public vote under RCW 80.52.040.

[59] Concerned Ratepayers, 138 Wn.2d at 958.

however, that the PUD reviewed and "carefully evaluated" the technical specifications in the document as part of negotiations with the manufacturer and that this consideration was "clearly instrumental to the process of building the power plant."[60] The court held that although "mere reference to a document that has no relevance to an agency's conduct or performance may not constitute 'use,'" information that "bears a nexus with the agency's decision-making process" is within the parameters of the PRA.[61] Under this analysis, the generator specifications were a public record for purposes of the PRA.

Marysville emphasizes that "the City never received the documents or in any way possessed them; it obviously could not 'use' documents it never had." But the court in Concerned Ratepayers concluded that the agency did not have to possess a document to "use" it for purposes of the PRA, agreeing with the Court of Appeals that "possession of information is not determinative of the issue."[62]

Marysville also argues that unlike the court in Concerned Ratepayers, the trial court here did not specifically explain how the City applied the documents to any governmental decision, and "[t]hus, there is no essential nexus to governmental decisionmaking." Here, the trial court did not make a finding like the finding in Concerned Ratepayers that the agency "carefully evaluated" any

---

[60] Concerned Ratepayers, 138 Wn.2d at 961, 962.
[61] Concerned Ratepayers, 138 Wn.2d at 961, 960.
[62] Concerned Ratepayers, 138 Wn.2d at 959-60.

specific Strategies document. But the trial court identified specific actions Strategies employees took and memorialized in e-mail that "clearly furthered the interests of Marysville." For example, the court noted that documents Strategies generated on behalf of Marysville, such as communications Mike Davis issued to media outlets, "were made instrumental to Marysville's governmental ends or purposes" in the campaign against Cedar Grove.

Marysville also cites West v. Thurston County[63] to argue that records are not "used" where the agency never received them. In West, the records at issue were attorney billing invoices for amounts exceeding the county's insurance deductible.[64] Noting that the county never "'reviewed, evaluated, referred to or otherwise considered'" the invoices because they were not the county's responsibility to pay,[65] Division Two of this court held that there was no indication that the invoices "'had a nexus with Thurston County's decision-making process.'"[66] Therefore, the invoices were not public records under the PRA. In its brief and at oral argument, the City argued that like the county in West, while Marysville generally benefited from the work of the third-party contractor, the City did not "use" the specific documents at issue under the PRA definition.

---

[63] 168 Wn. App. 162, 275 P.3d 1200 (2012).
[64] West, 168 Wn. App. at 166-67.
[65] West, 168 Wn. App. at 185-86.
[66] West, 168 Wn. App. at 186.

We distinguish West. Unlike the extraneous invoices in that case, the Strategies records at issue, including communications with third parties, directly related to activities Strategies performed "at the behest of Marysville" to further the City's interests. One of the challenged Strategies e-mail particularly supports this conclusion. Although not addressed to the City, it contains the subject line "Cedar Grove" and directly refers to "Gloria and [the] Marysville folks" and the need to give them "'plausible deniability'" about materials Strategies created for the campaign against Cedar Grove. These communications, considered together with evidence that the City suspected from the day of Cappel's first request that Cedar Grove might pursue access to Strategies' records, establish a nexus between the 173 Strategies documents and Marysville's decision-making process. They show that Marysville used the Strategies documents within the meaning of the PRA.

The trial court found that "Marysville knew what Strategies was doing, paid them for those activities, was generally aware that there were documents in Strategies' possession created during those activities, and discussed the contents of some of those documents with Strategies." Contrary to the City's assertion at oral argument that it was "utterly oblivious" to the existence of these documents, the record before us shows that nine months before Cedar Grove

filed suit, Marysville knew about them and knew further that Cedar Grove might attempt to obtain these records with a PRA request.

Marysville violated the PRA when it failed to disclose these records.

PRA Penalties

Marysville argues that even if the City violated the PRA, the penalties totaling $143,740 that the court imposed were "unreasonable and excessive." Once the trial court finds that an agency violated the PRA, daily penalties are mandatory, and the court must consider the entire statutory penalty range.[67] The amount, however, is in the trial court's discretion.[68] A court abuses its discretion when it exercises that discretion on untenable grounds or for untenable reasons.[69] The trial court has discretion to award a party who prevails against an agency in a PRA action "an amount not to exceed one hundred dollars for each day that he or she was denied the right to inspect or copy said public record."[70] Determining the appropriate PRA penalty involves two steps: (1) calculating the

---

[67] Neigh. Alliance, 172 Wn.2d at 726 (citing Yousoufian v. Office of King County Exec., 152 Wn.2d 421, 433, 98 P.3d 463 (2004) (Yousoufian II)); Yousoufian v. Office of Ron Sims, 168 Wn.2d 444, 466, 229 P.3d 735 (2010) (Yousoufian V).

[68] Neigh. Alliance, 172 Wn.2d at 726 (citing Yousoufian II, 152 Wn.2d at 433).

[69] Chuong Van Pham v. City of Seattle, 159 Wn.2d 527, 538, 151 P.3d 976 (2007).

[70] RCW 42.56.550(4).

number of days the agency improperly denied access to records and (2) determining the appropriate daily penalty, depending on the agency's actions.[71]

In Yousoufian v. Office of Ron Sims,[72] our Supreme Court adopted a multifactor test for determining the daily penalty amount. Mitigating factors that may decrease any penalty are

> (1) a lack of clarity in the PRA request; (2) the agency's prompt response or legitimate follow-up inquiry for clarification; (3) the agency's good faith, honest, timely, and strict compliance with all PRA procedural requirements and exceptions; (4) proper training and supervision of the agency's personnel; (5) the reasonableness of any explanation for noncompliance by the agency; (6) the helpfulness of the agency to the requestor; and (7) the existence of agency systems to track and retrieve public records.[73]

On the other hand, aggravating factors may support an increased penalty:

> (1) a delayed response by the agency, especially in circumstances making time of the essence; (2) lack of strict compliance by the agency with all the PRA procedural requirements and exceptions; (3) lack of proper training and supervision of the agency's personnel; (4) unreasonableness of any explanation for noncompliance by the agency; (5) negligent, reckless, wanton, bad faith, or intentional noncompliance with the PRA by the agency; (6) agency dishonesty; (7) the public importance of the issue to which the request is related, where the importance was foreseeable to the agency; (8) any actual personal economic loss to the requestor resulting from the agency's misconduct, where the loss was foreseeable to the agency; and (9) a penalty amount necessary to deter future misconduct by the agency considering the size of the agency and the facts of the case.[74]

---

[71] Bricker v. Dep't of Labor & Indus., 164 Wn. App. 16, 21, 262 P.3d 121 (2011) (citing Yousoufian V, 168 Wn.2d at 459).

[72] 168 Wn.2d 444, 467-68, 229 P.3d 735 (2010) (Yousoufian V).

[73] Yousoufian V, 168 Wn.2d at 467 (footnotes omitted).

[74] Yousoufian V, 168 Wn.2d at 467-68 (footnotes omitted).

Our Supreme Court emphasized that these factors "may overlap, are offered only as guidance, may not apply equally or at all in every case, and are not an exclusive list of appropriate considerations."[75] No one factor controls, and the factors "should not infringe upon the considerable discretion of trial courts to determine PRA penalties."[76]

Here, the trial court considered the aggravating factors. The court found that Marysville delayed its response with respect to the 19 documents and the Strategies records but also found that time was not of the essence. The court found a lack of strict compliance with the PRA as to the 15 records wrongly withheld as privileged. The court also found a lack of reasonable explanation for the withholding of most of the records from the group of 19. The court also noted that the City made the wrong determination about the 15 records it withheld under a claim of privilege. Consequently, the City did not provide a reasonable explanation.

With respect to the 173 Strategies documents, the court found negligent, reckless, bad faith, or intentional noncompliance with the PRA. Specifically, the court found, "Marysville's explanation regarding these documents—that they were not allegedly within the possession or control of Marysville—was a situation only created to intentionally provide Marysville with 'plausible deniability' of

---

[75] Yousoufian V, 168 Wn.2d at 468.
[76] Yousoufian V, 168 Wn.2d at 468.

Strategies' activities and to attempt to insulate the documents created during those activities from production." The court stated that it did not find dishonesty but did find "strategic planning on Marysville's part to avoid or delay the production of the documents in Strategies' possession." The court found that the issue is "extremely important," both because of the odor issue in the region and because of Marysville's attempts to avoid the reach of the PRA: "Simply put, 'plausible deniability' of the law should not be a part of our government." With respect to economic loss to the requester, the court found that "Marysville's conduct has had a significant impact on Cedar Grove." Finally, the court found that a penalty was necessary to deter future misconduct.

The City contends that the trial court abused its discretion by considering only the Yousoufian aggravating factors without explicitly considering the mitigating factors. But our Supreme Court's discussion in Yousoufian V emphasizes the trial court's discretion in applying the factors. Moreover, as Cedar Grove points out in its brief, several of the aggravating factors are mirror images of the mitigating factors. Therefore, it is fair to say that when the trial court found, for example, a delayed response by the agency, it implicitly also found the lack of a prompt response.

Marysville also argues that its search and compliance were reasonable and that despite producing thousands of documents, the trial court "pilloried" the

City for withholding a small number of "inconsequential" documents as well as documents it never had or used. In a statement of additional authorities, Marysville cites Andrews v. Washington State Patrol[77] to argue for a "flexible approach that focuses upon the thoroughness and diligence of an agency's response." In Andrews, the "beleaguered" agency, due to the volume of the requested records and the number of other pending requests, did not comply with its self-imposed time estimates.[78] The plaintiff alleged that the agency violated the PRA by not providing "'the fullest assistance'" and "'the most timely possible action'" as the statute requires.[79] Division Three disagreed, holding that a "mechanically strict finding of a PRA violation" whenever a government agency missed a timeline would not further the purpose of the PRA, which is to ensure that agencies respond with "reasonable thoroughness and diligence to public records requests."[80] Finding that there was no dispute about the agency's diligence or thoroughness, the court affirmed the trial court's summary dismissal of the PRA lawsuit.[81]

But Andrews does not support Marysville's position. Here, although the process the City's public records officer used complied with the PRA, the record

---

[77] 183 Wn. App. 644, 646, 334 P.3d 94 (2014), review denied, 182 Wn.2d 1011 (2015).
[78] Andrews, 183 Wn. App. at 646.
[79] RCW 42.56.100; Andrews, 183 Wn. App. at 646.
[80] Andrews, 183 Wn. App. at 653.
[81] Andrews, 183 Wn. App. at 653-54.

as a whole does not show that the City responded with "reasonable thoroughness and diligence to public records requests." Rather, the record demonstrates that certain members of city government and Strategies intentionally withheld responsive records and pursued a policy of evading the requirements of the PRA. The PRA makes clear that it is not up to an agency to decide which records are consequential or inconsequential.[82] And Marysville's position ignores the fact that a court assesses penalties on the basis of what documents the government withheld, not what it produced.

In its discretion, the trial court considered the entire statutory penalty range and made findings on the aggravating Yousoufian factors. Especially given that the trial court found most of the aggravating factors to be present, it did not abuse its "considerable" discretion in assessing penalties.[83]

Marysville's Motion for Reconsideration

In denying Marysville's motion for reconsideration, the court excluded declarations the City submitted from Gloria Hirashima, Al Aldrich, and Tulalip Tribes Manager Martin Napeahi. Citing Sligar v. Odell,[84] the court ruled, "These declarations constitute new evidence that could have been presented at the time

---

[82] See RCW 42.56.030.
[83] See Bricker, 164 Wn. App. at 29 ($90 daily penalty not abuse of discretion where trial court found almost all the Yousoufian aggravating factors and "given Bricker's need to institute legal action before the agency adhered to its obligations under the law").
[84] 156 Wn. App. 720, 734, 233 P.3d 914 (2010).

the court was considering the original Motion, and the Court therefore refuses to consider them." The City challenges the trial court's ruling as an abuse of discretion.

CR 59(a)(4) permits a trial court to grant reconsideration if the moving party introduces "[n]ewly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial." This court reviews a trial court's order on reconsideration, including its admission or exclusion of additional evidence, for manifest abuse of discretion.[85]

Marysville argues that the court should have admitted the declarations because they show "why the Court's findings are in error" and because "it is obvious the trial court's decision was predicated upon a visceral reaction to the 'plausible deniability' comment and a lack of understanding of the relationship of Strategies with the Tulalip Tribe[s]." But the three declarations do little more than reargue disputed issues, and the City offers no reason why it could not have presented this evidence earlier. We affirm the trial court's exclusion of the declarations and denial of Marysville's motion for reconsideration.

---

[85] Sligar, 156 Wn. App. at 734; Morinaga v. Vue, 85 Wn. App. 822, 831, 935 P.2d 637 (1997).

Cedar Grove's Cross Appeal: Attorney Fees

Cedar Grove cross appeals the trial court's attorney fee award. Although conceding that the court had discretion to reduce the hourly rates or time billed, Cedar Grove asserts that the court's additional 40 percent reduction of billable hours was a "manifestly unreasonable" abuse of discretion.

A prevailing party in a PRA action "shall be awarded all costs, including reasonable attorney fees, incurred in connection with such legal action."[86] The amount of attorney fees is within the discretion of the trial court.[87] To calculate attorney fees, courts use the lodestar method, in which the court multiplies a reasonable attorney rate by a reasonable number of hours worked.[88] In determining a reasonable number of hours, the court "discounts hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time."[89] The court "may consider the necessity of adjusting [the lodestar] to reflect factors not

---

[86] RCW 42.56.550(4); Kitsap County Prosecuting Atty's Guild v. Kitsap County, 156 Wn. App. 110, 122, 231 P.3d 219 (2010) (fees and fines mandatory under PRA when agency wrongfully denies access to public records).

[87] Sanders, 169 Wn.2d at 867; Haines-Marchel v. Dep't of Corr., 183 Wn. App. 655, 674-75, 334 P.3d 99 (2014) (citing Neigh. Alliance, 172 Wn.2d at 728); Berryman v. Metcalf, 177 Wn. App. 644, 656-57, 312 P.3d 745 (2013), review denied, 179 Wn.2d 1026 (2014).

[88] Sanders, 169 Wn.2d at 869.

[89] O'Neill v. City of Shoreline, 183 Wn. App. 15, 25, 332 P.3d 1099 (2014).

considered up to this point."[90] Courts have also recognized the utility of applying percentage reductions to fee requests.[91]

The fee applicant has the burden to show that a fee is reasonable.[92] A trial court must support its fee award by entering findings of fact and conclusions of law.[93] The court's findings "must do more than give lip service to the word 'reasonable.' The findings must show how the court resolved disputed issues of fact and the conclusions must explain the court's analysis."[94]

Here, the court made three separate reductions in Cedar Grove's fee request. First, the court reduced the requested hourly rates. Cedar Grove's counsel requested $375 per hour for the principal attorney's time, $275 per hour for associates' time, and $130 per hour for the paralegal's time. The court found that attorneys of comparable skill and experience in Snohomish County, including PRA specialists, do not charge more than $300 an hour. The court also

---

[90] Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 598, 675 P.2d 193 (1983); see also Sanders, 169 Wn.2d at 869.

[91] See Clausen v. Icicle Seafoods, Inc., 174 Wn.2d 70, 82, 272 P.3d 827 (2012) (appellate courts have used a percentage reduction when the specifics of a case make segregating actual hours difficult); Welch v. Metro. Life Ins. Co., 480 F.3d 942, 948-49 (9th Cir. 2007) (20 percent reduction appropriate where trial court "expressly correlated its reduction for quarter hour billing to [law firm's] actual over-billing"); Gates v. Deukmejian, 987 F.2d 1392, 1400 (9th Cir. 1992) (use of percentages acceptable as long as trial court independently reviews applicant's fee request and sets forth "concise but clear" explanation of its reasons for choosing given percentage).

[92] Berryman, 177 Wn. App. at 657.

[93] Berryman, 177 Wn. App. at 657-58.

[94] Berryman, 177 Wn. App. at 658.

found that this case involved a "relatively straightforward application of PRA law and the attorney-client privilege." Finally, the court noted that the fee was fixed, not contingent. The court reduced reasonable hourly rates to $300 per hour for the principal attorney's work, $200 per hour for associates' work, and $100 per hour for the paralegal's work.

Next, the court reduced the reasonable number of hours in two ways. First, the court considered the April summary judgment motion and determined that because the City wrongfully withheld only 15 of the 22 documents at issue, some of the 862.2 hours Cedar Grove billed were spent on unsuccessful theories. The court therefore reduced the number of hours proportionately for a reduction of 37.5 percent. Second, the court found that the total hours billed included "wasteful, duplicative hours" and warranted a reduction for that reason as well. The court noted in particular the "relatively straightforward nature of the case," the fact that the hours billed by Cedar Grove's counsel were double those billed by Marysville's counsel, and the large number of hours Cedar Grove billed after it prevailed on summary judgment and therefore knew it would receive an attorney fee award. The court reduced the total number of Cedar Grove's billable hours by 40.0 percent, resulting in a total fee award of $121,110.

Citing Sargent v. Seattle Police Department,[95] Cedar Grove argues that the court abused its discretion by excluding fees billed after April 2013 for the reason that these fees related to claims on which it prevailed at the second summary judgment hearing in August 2013. The record supports Cedar Grove's contention that much of the work its attorneys billed after the April 2013 summary judgment hearing was in conjunction with successful theories related to the second and third groups of documents. Under Sargent, therefore, it would have been error for the trial court to exclude those fees simply because they followed the first successful summary judgment hearing. But unlike the court in Sargent, the trial court here did not completely exclude fees incurred after the hearing—it reduced them by 40 percent. As Cedar Grove acknowledges, the court has discretion to adjust rates and hours. It also has discretion to make additional adjustments after applying the lodestar analysis.

Cedar Grove also argues that the court's 40 percent reduction is manifestly unreasonable because of the procedural posture of the case and the City's intransigence. First, Cedar Grove argues that as the moving party, it had to file more briefs, as well as a motion to compel, that the defendant Marysville did not have to file. Cedar Grove contends that although "this case should have been relatively straightforward," Marysville's intransigence forced Cedar Grove's

---

[95] 167 Wn. App. 1, 25-26, 260 P.3d 1006 (2011), rev'd in part on other grounds, 179 Wn.2d 376, 314 P.3d 1093 (2013).

counsel to spend "hundreds of hours" pursuing the Strategies documents in particular. Cedar Grove also points out that while Marysville could reduce the hours the City billed for outside counsel by using the assistance of salaried city employees, Cedar Grove's counsel billed on an hourly basis for all its work on the case. These arguments do not establish that the trial court abused its discretion in reducing the fee request.[96]

Finally, Cedar Grove argues that the court's 40 percent reduction "undermined the liberal purpose of the PRA," noting that this court has observed that the purpose of the fee-shifting provisions in remedial statutes is different from the purpose of similar provisions in other statutes. But our Supreme Court has recognized the trial court's discretion to adjust fee awards not only in cases involving private tort claims but also in cases involving remedial statutes such as the PRA and the Consumer Protection Act.[97] Contrary to Cedar Grove's assertion that the trial court's 40 percent reduction was "arbitrary," the court supported its order with findings and conclusions that explain its analysis and show how it resolved disputed issues of fact. Because Cedar Grove does not establish any abuse of discretion in the court's methodology, we affirm the court's award of fees and costs.

---

[96] See Sanders, 169 Wn.2d at 868 ("While we may quibble with some of the trial court's reasoning, on the whole its award of fees and costs was within its discretion.").

[97] Ch. 19.86 RCW; see, e.g., Sanders, 169 Wn.2d at 868; Bowers, 100 Wn.2d at 593-600.

Fees and Costs on Appeal

Cedar Grove requests attorney fees on appeal under RAP 18.1 and RCW 42.56.550(4). A party may recover attorney fees only for work on successful issues.[98] We grant Cedar Grove's request for those costs and reasonable attorney fees related to the PRA issues on which it prevailed on appeal, subject to its timely compliance with RAP 14.4(a) and 18.1.

CONCLUSION

We wish to be clear about what we are not doing in this opinion. We are not articulating a new standard that makes every record a government contractor creates during its engagement with an agency a public record subject to the PRA. Nor do we create a new duty on the part of a public agency to search the records of all its third-party contractors each time it receives a PRA request. Instead, we have applied established precedent about a private entity acting as the functional equivalent of a public agency to the analogous situation of a private entity acting as the functional equivalent of a public employee.

Because this record supports the trial court's decision that Strategies acted as the functional equivalent of a Marysville employee and that Marysville used the records Strategies created while acting in that capacity, the PRA applies to those records. We affirm the trial court's decision that Marysville

---

[98] O'Neill, 183 Wn. App. at 25.

No. 71052-4-I / 42

violated the PRA by wrongfully withholding public records. We affirm the court's orders assessing penalties, awarding costs and attorney fees, and denying reconsideration. We grant Cedar Grove's request for costs and reasonable attorney fees related to the issues on which it prevailed on appeal, subject to its timely compliance with RAP 14.4(a) and 18.1.

_Leach, J._

WE CONCUR:

_Schindler, J_          _Becker, J._

-42-