**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

DECEMBER 18, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
DECEMBER 18, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STEVEN HORVATH, | ) | |
| | ) | |
| Petitioner, | ) | No. 103339-7 |
| | ) | |
| v. | ) | |
| | ) | En Banc |
| DBIA SERVICES DBA | ) | |
| METROPOLITAN IMPROVEMENT | ) | |
| DISTRICT | ) | Filed: December 18, 2025 |
| | ) | |
| Respondent. | ) | |
| | ) | |

GONZÁLEZ, J.—The people of our state adopted the public disclosure act by initiative half a century ago. Initiative 276, LAWS OF 1973, ch. 1 (approved November 7, 1972).  That initiative embodied a principle expressed in the official voters pamphlet:

**The People Have the Right to Know . . .**

Our whole concept of democracy is based on an informed and involved citizenry. Trust and confidence in governmental institutions is at an all time low. High on the list of causes of this citizen distrust are secrecy in government and the influence of private money on governmental decision making. Initiative 276 brings all of this out into the open for citizens and voters to judge for themselves.

*State of Washington Official Voters Pamphlet, General Election* 10 (Nov. 7, 1972), https://www.sos.wa.gov/library/research-collections/classics-washington-history/1972-voters-pamphlet. The act imposed stringent transparency requirements on elections, campaign financing, lobbying, and public records. LAWS OF 1973, ch. 1, § 1.

In the years since, the legislature has reorganized and amended the original public disclosure act and separated the records provisions into its own chapter of the code now called the Public Records Act. LAWS OF 2005, ch. 274. The guiding principle that disclosure is the rule and secrecy the exception remains. *See* LAWS OF 1973, ch. 1, §§ 26, 31; *Fisher Broad.–Seattle TV LLC v. City of Seattle*, 180 Wn.2d 515, 521, 326 P.3d 688 (2014) (quoting *Sargent v. Seattle Police Dep't*, 179 Wn.2d 376, 385, 314 P.3d 1093 (2013)).

To prevent public records from becoming unavailable through private contracting, we have construed the Public Records Act to apply to private entities that are the functional equivalent of government agencies. We have regularly used the multifactor *Telford* test to decide whether the Public Records Act applies to a particular private entity. *Fortgang v. Woodland Park Zoo*, 187 Wn.2d 509, 512-13, 387 P.3d 690 (2017) (citing *Telford v. Thurston County Bd. of Comm'rs*, 95 Wn. App. 149, 162-63, 974 P.2d 886 (1999)).

In this case, a requester sought records relating to a business and parking improvement district that were held by the private nonprofit corporation DBIA Services, which managed and largely provided district programs and services for the city of Seattle.  At summary judgment, the superior court concluded the corporation was not the functional equivalent of a government agency and thus not subject to the Public Records Act.  The Court of Appeals affirmed that decision.

We conclude that DBIA Services is the functional equivalent of a government agency and thus subject to the Public Records Act.  Accordingly, we reverse and remand to the trial court for any further proceedings necessary consistent with this opinion.

BACKGROUND

The Metropolitan Improvement District, the Downtown Seattle Association, and DBIA Services

Our legislature has authorized municipalities to create parking and business improvement areas and to support those districts through assessments imposed on those properties.  Ch. 35.87A RCW; *see also* David J. Kennedy, Note, *Restraining the Power of Business Improvement Districts: The Case of the Grand Central Partnership*, 15 YALE L. & POL'Y REV. 283 (1996) (discussing the history of and controversies around publicly created municipal improvement areas).

Improvement areas are created by the local legislative authority. RCW 35.87A.030. Their creation can be initiated by the legislative body itself or by a petition from the owners of 60% of the assessed value in an area. *Id.* Property owners in these improvement areas pay special assessments to fund various types of improvements that must benefit their properties. RCW 35.87A.010.[1] Municipalities collect the funds and may either carry out the projects themselves or contract with a local chamber of commerce or "similar business association" to do so. RCW 35.87A.110.

The private nonprofit Downtown Seattle Association was formed in 1958 by a group of prominent King County residents to "promote the development, beautification and improvement of the City of Seattle." Clerk's Papers (CP) at 103-04, 112. The association, among others, petitioned the Seattle City Council to create the Metropolitan Improvement District in 1999. The city complied via an ordinance that lays out the organization, oversight, and purpose of the district. CP at 105; Seattle Ordinance 124175 (May 6, 2013), *amended by* Ordinance 124235 (July 31, 2013).

---

[1] Under our constitution, property must be specially benefited to be subject to a special assessment. WASH. CONST. art. VII, § 9; *City of Seattle v. Rogers Clothing for Men, Inc.*, 114 Wn.2d 213, 223, 787 P.2d 39 (1990). That benefit can derive from services. *Rogers*, 114 Wn.2d at 225-26.

The Metropolitan Improvement District currently covers nearly 300 square blocks of downtown Seattle. To fund the district, the council collects assessments from more than 800 district property owners. Seattle Ordinance 124175, at 4; CP at 163, 179. These assessments pay for police patrols, other public safety efforts, cleaning, marketing, economic development, transportation, and other projects "intended to extend, enhance and fill gaps in existing municipal services." CP at 179, 163.

A ratepayer advisory board (Board) oversees district operations. Seattle Ordinance 124175, at 11; CP at 106, 134. The Board is made up of 35 property owners recommended by the Board and appointed by the city finance director. Among other things, the Board advises the city council on who to hire as the district's program manager.

The Board has repeatedly and successfully recommended the city hire DBIA Services as the program manager. DBIA is a private nonprofit corporation and a subsidiary of the Downtown Seattle Association. On behalf of the district, DBIA manages, among other things, cleaning and maintenance, community service and hospitality, welfare checks, public safety, public space operations, economic development and planning, transportation and parking services, communications and marketing, and management and operations. DBIA provides some of those services through its own employees and some through contractors. DBIA directly

5

hires "downtown ambassadors," who do everything from assisting transit riders to removing trash to performing welfare checks. CP at 107. DBIA also hires private security and, under a separate contract, works with the parks department to provide programming at Westlake Park and Occidental Square.

DBIA also contracts with the Seattle Police Department to fund "emphasis patrols" in the Metropolitan Improvement District in areas it identifies as "neighborhood hot spots." CP at 107, 249, 430, 489. DBIA reimburses the police department for those patrols, which are under the control of the police department.

More than 92 percent of DBIA's budget comes from assessments imposed on local property owners under the ordinance, collected by the city, held by the city in a city financial account, and paid to DBIA monthly upon invoicing. DBIA's 2022-2023 budget was $16,627,731. DBIA also receives voluntary contributions from ratepayers, grants, private donations, fees for services, King County funds for "downtown recovery efforts," and sponsorship funds. CP at 108-09, 344.

DBIA files its taxes as "DBIA Services dba Metropolitan Improvement District" and invoices the city of Seattle referring to itself as "DBIA Services dba Metropolitan Improvement District." CP at 581, 613, 730. DBIA has also regularly identified itself as the "MID BIA" (an acronym for the Metropolitan Improvement District Business Improvement Area) CP at 376, 382, 389.

Many of the public facing documents in the record do not make a distinction between the Metropolitan Improvement District and DBIA. For example, the business plan the Board prepared in support of renewal of the ordinance for 10 years refers to work done by the district's staff without making any distinction as to whether the district did that work directly or through DBIA.

While DBIA acknowledges that it has identified itself as "doing business as" the district, it contends that this was "for identification purposes with the City: the name 'DBIA Services' would have been unfamiliar but the name 'Metropolitan Improvement District' would have been easily associated with the newly-formed [district]." CP at 727. Similarly, it contended its use of "Metropolitan Improvement District" on letterhead and in internal documents was a practical way of identifying which entity DBIA Services is representing at the time. CP at 727-28.

Steve Horvath's Public Records Act Request

Horvath lives within, and is assessed to support, the Metropolitan Improvement District. In 2021, he requested records relating to assessments, budgets, taxes, job descriptions, meeting minutes, and compensation paid by the district, among other things.

Horvath initially sought those records from Seattle's Office of Economic Development, which works with stakeholders to create parking and business

improvement areas across the city. After several months, he was told the office did not have the records he was seeking and was directed to seek the information from Elisabeth James, chief operating officer of the Downtown Seattle Association. The Association shares staff with DBIA. While making clear she believed that the Downtown Seattle Association was not a public agency subject to the Public Records Act, James did provide many of the records Horvath requested. She did not, however, provide the staff compensation information Horvath was seeking.[2]

Procedural History

Horvath filed a Public Records Act complaint against "DBIA Services dba Metropolitan Improvement District." CP at 1. After discovery, the parties filed cross motions for summary judgment. DBIA also moved for declaratory judgment that it was not a governmental entity for purposes of the Public Records Act.

Horvath argued that the Metropolitan Improvement District was the functional equivalent of a government agency and that it and DBIA were legally

---

[2] Specifically, Horvath was not given "Current (2021) annual compensation information (wages and benefits) for all staff identified on https://downtownseattle.org/about/our-team/all-staff/ that perform services for and whose pay and benefits are either wholly or partially funded by Metropolitan Improvement District Business Improvement Area] revenue (regardless of its source)." CP at 110; 349-51. After discussing the matter with district leadership, Ken Lederman, then general counsel to Metropolitan Improvement District, expressed the concern that providing that information would impact the ability to recruit and retain employees. This appears to be the only outstanding record at issue in this suit, though amicus American Civil Liberties Union of Washington (ACLU) suggests that under the Court of Appeals opinion, public records concerning decisions regarding police activity funded by improvement districts would be shielded from public disclosure.

and factually a single integrated entity.  Horvath also stressed that in internal documents, defendants referred to the district and DBIA Services interchangeably. He noted that his request to the district for district records was responded to by employees and officers of the association and DBIA.  While he acknowledged DBIA was created by private stakeholders, he argued that by doing business as the district, DBIA became bound by the Public Records Act.

DBIA argued that it was not the functional equivalent of a governmental entity and that DBIA and the Metropolitan Improvement District were separate entities.  *See* CP at 77, 534.

The superior court rejected Horvath's argument that DBIA and the district were a single entity for purposes of the Public Records Act.  The court found persuasive that the legislature had authorized municipalities to contract with private organizations to manage improvement area projects and that in its view, an improvement district "cannot 'do business' because it is a geographic area, not an actor."  CP at 743. It applied the *Telford* factors only to DBIA, granted DBIA's motions, and denied Horvath's in a lengthy written summary judgment order.

Horvath appealed.  The Court of Appeals rejected the parties' agreement that the trial court's summary judgment order should be reviewed de novo.  *Horvath v. DBIA Servs.*, 31 Wn. App. 2d 549, 558, 551 P.3d 1053 (2024).  Applying the abuse of discretion standard, the Court of Appeals affirmed.  *Id*. at 574.

9

The parties sought review of only the standard of review, which we granted. The American Civil Liberties Union of Washington Foundation (ACLU) submitted an amicus brief in support of Horvath on the merits.

ANALYSIS

The Public Records Act "is a 'strongly worded mandate for broad disclosure of public records.'" *Resident Action Council v. Seattle Hous. Auth.*, 177 Wn.2d 417, 431, 327 P.3d 600 (2013) (quoting *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978)). We interpret the act liberally with this purpose in mind. *Worthington v. WestNET*, 182 Wn.2d 500, 507, 341 P.3d 995 (2015) (quoting RCW 42.56.030). "The Act reflects the belief that the sound governance of a free society demands that the public have full access to information concerning the workings of the government." *Amren v. City of Kalama*, 131 Wn.2d 25, 31, 929 P.2d 389 (1997).

The parties agree, as do we, that appellate courts review a trial court's summary judgment ruling on liability de novo. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 501, 115 P.3d 262 (2005) (citing *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 92, 993 P.2d 259 (2000)); *Spokane Rsch. & Def. Fund v. City of Spokane*, 155 Wn.2d 89, 106, 117 P.3d 1117 (2005).[3] Summary

---

[3] The Court of Appeals erred in applying abuse of discretion review to the trial court's summary judgment ruling on liability. We have previously recognized that there are occasions where a trial court's summary judgment ruling on remedy or damages might warrant greater deference

judgment is appropriate only when, based on sworn affidavits from competent witnesses presenting admissible facts and appropriate authenticated documentation, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c); *Brannon v. Herman*, 56 Wn.2d 826, 828, 355 P.2d 792 (1960); 14A Douglas Ende, Washington Practice: Civil Procedure §§ 25:1-7, at 10-16 (3d ed. Supp. 2025). The material facts in this case are undisputed.

The parties have focused their briefing and argument on the merits. We exercise our discretion to address those merits and hold that DBIA is the functional equivalent of a government agency and thus subject to the Public Records Act.

A "public record" is "(1) a writing (2) related to the conduct of government or the performance of government functions that is (3) prepared, owned, used, or retained by a state or local agency." *Nissen v. Pierce County*, 183 Wn.2d 863, 879-80, 357 P.3d 45 (2015) (citing *Confederated Tribes of the Chehalis Rsrv. v. Johnson,* 135 Wn.2d 734, 746, 958 P.2d 260 (1998)); RCW 42.56.010(3). For the purposes of the act, the legislature has defined "agency" broadly:

> "Agency" includes all state agencies and all local agencies. "State agency" includes every state office, department, division, bureau, board, commission, or other state agency. "Local agency" includes every county, city, town, municipal corporation, quasi-municipal corporation, or special purpose

---

than afforded by de novo review. *See Borton & Sons, Inc. v. Burbank Props., LLC*, 196 Wn.2d 199, 206, 471 P.3d 871 (2020); *Niemann v. Vaughn Cmty. Church*, 154 Wn.2d 365, 113 P.3d 463 (2005). But at this stage, only liability is at issue.

district, or any office, department, division, bureau, board, commission, or agency thereof, or other local public agency. "Agency" does not include a comprehensive cancer center participating in a collaborative arrangement as defined in RCW 28B.10.930 that is operated in conformance with RCW 28B.10.930.

RCW 42.56.010(1). In *Telford*, the Court of Appeals recognized that the definition of "agency" was ambiguous as applied to the Washington State Association of Counties and the Washington Association of County Officials, both of which had some features of local agencies and some features of private ones. 95 Wn. App. at 152, 158. Based on case law in other state and federal courts, the *Telford* court adopted the test we now use to "prevent[] governments from evading public oversight through creative contracting." *Fortgang*, 187 Wn.2d at 513.

Under the multifactor *Telford* test, the court considers "(1) whether the entity performs a government function, (2) the extent to which the government funds the entity's activities, (3) the extent of government involvement in the entity's activities, and (4) whether the entity was created by the government." *Id.* at 518 (citing *Clarke v. Tri-Cities Animal Care & Control Shelter*, 144 Wn. App. 185, 192, 181 P.3d 881 (2008)).

No one factor is dispositive, and we have never held the factors to be exclusive. "Courts applying the test consider whether 'the criteria on balance . . . suggest that the entity in question is the functional equivalent of a state or local agency.'" *Id.* (alteration in original) (quoting *Clarke*, 144 Wn. App at

12

192).  The *Telford* factors are applied, "[b]earing in mind that the purpose of the *Telford* test is to determine whether, with respect to the particular defendant entity at hand, immunity from [Public Records Act] requirements would frustrate the goal of government transparency."  *Id.* at 524.

A. GOVERNMENTAL FUNCTION.  First, we consider whether the entity performs core governmental functions.  *Id.*  Core governmental functions include (but are not limited to) police power functions.  *Id.* at 524-25.  Generally, the police power concerns the "peace, security, health, morals, and general welfare of a community."  *State v. Mountain Timber Co.*, 75 Wash. 581, 586, 135 P. 645 (1913), *aff'd*, 243 U.S. 219, 37 S. Ct. 260, 61 L. Ed. 685 (1917).

In *Telford*, the court held that consulting with state and county officials, appointing persons to state and county boards, and participating in various state boards and commissions were governmental functions.  95 Wn. App. 163-64.  In *Cedar Grove*, the court held that the government necessarily conceded that the work of a third-party contractor that provided professional communications services to a city was performing a governmental function when it argued the employee was "act[ing] as the functional equivalent of a city employee."  *Cedar Grove Composting, Inc. v. City of Marysville*, 188 Wn. App. 695, 719, 354 P.3d 249 (2015).  In *Clarke*, the court held that an animal shelter was performing a

governmental function in carrying out animal control services. 144 Wn. App. at 194.

In *Spokane Research*, the court concluded that providing community services that benefited low- and moderate-income residents was not a government function. *Spokane Rsch. & Def. Fund v. W. Cent. Cmty. Dev. Ass'n*, 133 Wn. App. 602, 609, 137 P.3d 120 (2006). Other courts have held that "[w]hen such programs are conducted by an organization as a contractor rather than as governmental entity, however, the organization is not performing a governmental function." *Meri-Weather, Inc. v. Freedom of Info. Comm'n*, 47 Conn. Supp. 113, 119, 778 A.2d 1038 (Conn. Super. Ct. 2000), *aff'd*, 63 Conn. App. 695, 778 A.2d 1006 (2001). Simply put, "serving public interests is not the exclusive domain of the government." *Spokane Rsch.*, 133 Wn. App. at 609.

DBIA provides sanitation, public safety, hospitality, marketing, business development, transit, and management services. Seattle Ordinance 124175, § 5. It also engages and funds the police department to perform emphasis patrols.[4] Thus, unlike the organization in *Spokane Research*, DBIA does more than just "provide community services." 133 Wn. App. at 609.

---

[4] We recognize that the Seattle Police Department retains control over the officers. However, as amicus ACLU points out, emphasis patrols are usually "implemented at the behest of public officials," and the Public Records Act ordinarily provides access to records of "the governmental and political process behind the public official's decision." Amicus Br. of ACLU Found. at 14-15. The identification of "neighborhood hot spots," though not dispositive, resembles a governmental function.

We conclude that at least some of the services DBIA provides, such as public safety and sanitation, support the peace, security, health, and general welfare of the city and thus are core governmental functions. *See Mountain Timber Co.*, 75 Wash. at 586. This factor weighs in favor of concluding that DBIA is the functional equivalent of a government agency.

B. GOVERNMENT FUNDING. The more public funding an agency receives, the more likely this factor is met. *Fortgang*, 187 Wn.2d at 529. The "foremost consideration" is "the *percentage* of funds attributable to public sources," although "the type of funding matters," as well. *Id*. About 93 percent of DBIA's funding traces to assessments imposed on district property owners by ordinance. The amount of the assessments is determined by the city council, and, by law, all funds raised from the assessments are dedicated to the district. Seattle Ordinance 124175, § 14; RCW 35.87A.120; WASH. CONST. art. VII, § 9. This funding scheme is *not* the type of "ordinary fee-for-services model [that] typically weighs against functional equivalency." *Fortgang*, 187 Wn.2d at 529. This factor weighs heavily in favor of concluding that DBIA is the functional equivalent of a government agency.

C. GOVERNMENT INVOLVEMENT. Our analysis of the "government control" factor "distinguishes between day-to-day control (supporting functional equivalency) and mere regulation (supporting private entity status)." *Id.* at 530.

DBIA submitted unrebutted evidence that the city is not involved in day-to-day operations. This factor weighs against concluding that DBIA is the functional equivalent of a government agency.

D. GOVERNMENT CREATION. Our analysis of the final *Telford* factor focuses less on "whether the government was *involved* in the entity's creation" but, rather, "whether a government *actually incorporated* the entity at issue." *Id.* at 531 (emphasis added). As discussed above, the Downtown Business Association petitioned the city to create the Metropolitan Improvement District, which then contracted with DBIA. However, the government ultimately did not create DBIA. It was created by the Downtown Business Association, a private nonprofit. This factor weighs against concluding that DBIA is the functional equivalent of a government agency.

The *Telford* factors are fairly balanced. But we apply these factors "[b]earing in mind that the purpose of the *Telford* test is to determine whether, with respect to the particular defendant entity at hand, immunity from [Public Records Act] requirements would frustrate the goal of government transparency." *Id.* at 524. For an individual like Horvath, who lives in the Metropolitan Improvement District and pays assessments that fund DBIA's operations and the salaries of its employees, DBIA's immunity from the Public Records Act would clearly frustrate the goal of government transparency.

In addition to those factors, Horvath argues that we should treat DBIA and the Metropolitan Improvement District as a single entity because DBIA often holds itself out to be the district. *See* CP at 375, 394, 422, 424. In this case, this factor weighs in favor of concluding DBIA's records are public records, especially given the government's control and creation of the district itself.

Given the undisputed facts of this case and the goal of government transparency, we conclude that DBIA is the functional equivalent of a government agency. Horvath's request for attorney fees on appeal is granted with the amount to be determined by the trial court after remand.

CONCLUSION

We hold that DBIA is the functional equivalent of a government agency and thus subject to the Public Records Act. Accordingly, we reverse the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

González, J.

WE CONCUR:

Stephens, C.J.

Johnson, J.

Gordon McCloud, J.

Yu, J.

Montoya-Lewis, J.

Whitener, J.

Mungia, J.

No. 103339-7

MADSEN, J. (concurring in part and dissenting in part)—I agree with the

majority's holding that the standard of review on summary judgment is de novo. That is

the only issue on which we granted review, and I would limit our scrutiny accordingly.

Nevertheless, the parties in this case briefed and argued a different issue: whether DBIA

Services, a private nonprofit, qualifies as the functional equivalent to a public agency and

is therefore subject to the Public Records Act (PRA), chapter 42.56 RCW.

Functional equivalency is determined by applying a four-factor test established in

*Telford v. Thurston County Board of Commissioners*, 95 Wn. App. 149, 162-63, 974 P.2d

886 (1999). Applying these factors to DBIA, the trial court concluded that the nonprofit

was not functionally equivalent to a public agency. I would affirm the trial court.

Because the majority comes to a different conclusion, I respectfully dissent.

1

BACKGROUND

This case implicates three local and state entities. The primary actor is DBIA Services, which operates as the program manager for the Metropolitan Improvement District (MID). Both are local to the city of Seattle. The MID was created pursuant to state legislation—parking and business improvement areas (PBIAs), chapter 35.87A RCW. Understanding how these entities originated and the purposes underlying them is helpful in determining whether DBIA is the functional equivalent of a government agency or merely a private government contractor.

Lawmakers authorized cities and towns to create PBIAs in 1971. LAWS OF 1971, 1st Sp. Sess., ch. 45. The legislative purpose of PBIAs is to drive economic development and neighborhood revitalization, and to facilitate cooperation of merchants, businesses, and residential property owners, which in turn assists with trade, economic viability, and livability. RCW 35.87A.010. PBIAs are geographic areas that are established for certain purposes, including acquiring, constructing, or maintaining parking facilities; decorating public places; sponsoring or promoting public events; furnishing music; providing professional management, planning, and promotion; providing maintenance and security for common, public areas; or providing transportation services. RCW 35.87A.010(1).

PBIAs are funded by special assessments on all businesses and residential buildings in the improvement area and must benefit the properties within that area specifically, rather than the community at large. *City of Seattle v. Rogers Clothing for Men, Inc.*, 114 Wn.2d 213, 227-28, 787 P.2d 39 (1990). To establish a PBIA, citizens

must draft and submit a petition to the legislative body. RCW 35.87A.030. The petition must contain a description of the boundaries of the proposed area, proposed "uses and projects to which the proposed special assessment revenues shall be put and the total estimated cost thereof," and estimated rate of levy of the assessments broken down by business and residential payers. *Id.* There is then a hearing on the petition. RCW 35.87A.060. If the legislative authority decides to establish the proposed area, it shall do so by ordinance. RCW 35.87A.100. That ordinance must contain a description of the boundaries of the area, statement of the businesses and residential projects subject to the special assessments, rate of assessments, and importantly the "uses to which the special assessment revenues shall be put." *Id.*

The legislative authority has "sole discretion" on how to use the revenues "within the scope of the purposes." RCW 35.87A.110. That authority may *contract* with a chamber of commerce or other business association operating within the legislative authority's boundaries to "administer the operation of a [PBIA], including any funds." *Id.* The purposes and functions of PBIAs may be accomplished in part by "any other method otherwise provided by law, including provisions for local improvements." RCW 35.87A.220.

The city of Seattle created a local PBIA, the MID, in 1999 and renewed it most recently in 2023. In Seattle's 2013 ordinance renewing the MID, it provided a list of specific programs for which funds must be spent: clean services, safety outreach and hospitality, marketing and communication, business development and market research,

and transit bike and parking services. The city of Seattle sets the amount and collects the assessments, with a program manager handling daily operations. The ratepayer advisory board, consisting of private citizens within the MID assessment area, selects the program manager. That manager determines the specific services to be provided through a work plan and budget submitted to the advisory board, and ratepayers vote on approval at an annual meeting. The work plan and budget, if approved, go to the city of Seattle and the city authorizes payment for services. The plan is limited to the specific services authorized by statute and ordinance.

Finally, DBIA is the contracted program manager for the MID. It is a private nonprofit corporation, affiliated with the Downtown Seattle Association (also a private nonprofit, created in 1958). None of the association's governing board or DBIA leadership are Seattle employees or officials. DBIA's contract calls for it to submit invoices to Seattle for its services for reimbursement.

Steve Horvath, a resident in the MID, requested numerous public records for the district from Seattle's Office of Economic Development. Horvath eventually requested records from the association. The association and DBIA provided many of the requested records but did not release staff compensation information.

Horvath then sued "DBIA Services DBA [(doing business as)] Metropolitan Improvement District" for violating the PRA. Clerk's Papers (CP) at 1-10. Horvath argued that DBIA and the MID were essentially the same entity and should be treated as such for PRA purposes, which DBIA disputed. At trial, Horvath and DBIA both sought

4

summary judgment.  Considering DBIA as a single entity under the *Telford* factors, the trial court issued a comprehensive ruling in favor of DBIA.  The court concluded DBIA was not the functional equivalent of a government agency and therefore not subject to the PRA.  The Court of Appeals affirmed, holding that the standard for summary judgment review was abuse of discretion rather than de novo and that the court properly applied *Telford* under the abuse of discretion standard.  *Horvath v. DBIA Servs.*, 31 Wn. App. 2d 549, 562-73, 551 P.3d 1053 (2024).

Horvath sought review in this court, which we granted.  At oral argument, Horvath agreed that the petition raised only the issue of the proper standard of review but asked this court to address the merits of the ruling below as an issue of statewide importance.  Wash. Sup. Ct. oral arg., *Horvath v. DBIA Servs.*, No. 103339-7 (May 27, 2025), at 1 min., 55 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/washington-state-supreme-court-2025051176/.

DISCUSSION

The PRA mandates government transparency by requiring among other things the disclosure of public records held by public agencies.  *See* LAWS OF 1973, ch. 1; RCW 42.56.010.  While disclosure may be the rule and secrecy the exception, the PRA's disclosure mandate applies only to *public agencies*.  *See* majority at 2.  On the other hand, governments may contract with private entities to perform various functions.  *E.g.*, *Fortgang v. Woodland Park Zoo*, 187 Wn.2d 509, 387 P.3d 690 (2017) (noting state legislation authorizing certain cities to contract with nonprofits for management and

5

operation of zoos and aquariums).  To ensure that government cannot evade public
oversight through creative contracting, Washington courts consider whether a private
entity is the functional equivalent of a government agency.  *Telford*, 95 Wn. App. at 162-
63.  This four-factor inquiry assists courts in deciding the central question of whether a
private entity has "step[ped] into the shoes of the local government" and is therefore
bound by public disclosure laws.  *Clarke v. Tri-Cities Animal Care & Control Shelter*,
144 Wn. App. 185, 194, 181 P.3d 881 (2008).

The *Telford* factors include (1) whether the entity performs a governmental
function, (2) the level of government funding, (3) the extent of government involvement
or regulation, and (4) whether the entity was created by government.  95 Wn. App. at 162
(citing *Bd. of Trs. v. Freedom of Info. Comm'n*, 181 Conn. 544, 436 A.2d 266, 270-71
(1980)).

As the majority notes, *Telford* is a balancing test and this court has not held the
factors to be exclusive.  Majority at 15.  Indeed, *Telford* recognized that an additional
consideration—whether an entity has the authority to make and implement decisions—
could be relevant and examined under the governmental function factor.  95 Wn. App. at
163 (citing *Marks v. McKenzie High School Fact-Finding Team*, 319 Or. 451, 423, 878
P.2d 417 (1994)); *Domestic Violence Servs. of Greater New Haven, Inc. v. Freedom of
Info. Comm'n*, 47 Conn. App. 466, 474, 704 A.2d 827 (1998) (applying the same factor).

As a preliminary matter, Horvath has argued consistently that DBIA and the MID
are a single entity to which *Telford* should be applied.  The trial court reasoned, however,

the MID is a geographic area and not an "actor" subject to the PRA. CP at 743, 745. The

majority does not discuss the nature of the MID but endorses some distinction between

the entities because it applies *Telford* only to DBIA—until the final factor, where the

majority considers them together. *See infra* at 19. I would apply *Telford* consistently and

only to DBIA.

1.       Governmental Function

The first *Telford* factor looks for "core" governmental functions or those that

cannot be delegated to the private sector. *Fortgang*, 187 Wn.2d at 524 (citing *Clarke*,

144 Wn. App. at 194; *Telford*, 95 Wn. App. at 165). The Court of Appeals has noted that

a local government may delegate performance of a public function to a private entity, but

it cannot avoid through delegation the responsibility to perform that function within PRA

obligations. *Cedar Grove Composting, Inc. v. City of Marysville*, 188 Wn. App. 695,

718, 354 P.3d 249 (2015) (citing *Clarke*, 144 Wn. App. at 194). This factor is concerned

with the "nature of the disputed entity's activities when determining whether it is

performing an inherently 'governmental function.'" *Fortgang*, 187 Wn.2d at 525-26.

A core or inherently governmental function includes the exercise of police powers.

Majority at 13 (citing *Fortgang*, 187 Wn.2d at 524). A city may contract with a private

entity to perform functions held to be police powers, such as solid waste handling.

*Ventenbergs v. City of Seattle*, 163 Wn.2d 92, 101-02, 178 P.3d 960 (2008). But an

entity does not perform a governmental function merely because it contracts with the

government pursuant to enabling legislation. *Fortgang*, 187 Wn.2d at 525. Therefore, a

reviewing court must examine the legislation authorizing improvement districts.

As previously stated, the purpose of PBIAs is to promote "economic development

and neighborhood revitalization." RCW 35.87A.010. To that end, the legislature

allowed municipalities to establish improvement areas that may acquire, construct, or

maintain parking facilities; decorate public places; sponsor or promote public events;

furnish music; provide professional management and promotion; provide maintenance

and security for common public areas; or provide transportation services. RCW

35.87A.010(1).

By its plain language, RCW 35.87A.010 does not delegate to improvement

districts either police or governmental administrative powers. *See Fortgang*, 187 Wn.2d

at 525-26. It does not authorize any listed purpose or activity that is *inherently public* or

that cannot be delegated to the private sector or obligate any district to perform that

function. *See id.*

Unfortunately, neither Horvath nor the majority meaningfully discusses the

enabling legislation, so I must presume the majority relies on subsection (1)(f)'s

authorization to provide security for common public areas as *implicating* the police

power. Again, however, nothing authorizes the districts themselves to undertake security

or any other activity authorized by the statute.

Turning first to security, clearly lawmakers did not intend security, which is

mentioned in the statute, to be equivalent to the core governmental function of law

enforcement. Subsection (1)(f) was added to RCW 35.87A.010 in 1985. *See* LAWS OF 1985, ch. 128, § 1. Public testimony in favor of the provision explained that it would "allow businesses to finance *private security* to supplement city law enforcement in areas requiring additional security." H. BILL REP. ON SUBSTITUTE H.B. 1129, at 2 (emphasis added).

Private security guards are not equivalent to governmental law enforcement. Where private security guards are invested by law with "plenary police powers such that they are de facto police officers," they may qualify as state actors. *Romanski v. Detroit Ent., LLC*, 428 F.3d 629, 637 (6th Cir. 2005) (emphasis omitted).[1] However, Washington law does not invest security guards with plenary power. A "private security guard" is defined as an individual licensed under chapter 18.170 RCW and employed or referred to as a security officer or guard, armed escort or bodyguard, armored vehicle guard, burglar alarm response runner, or crowd control officer. RCW 18.170.010(19). A "sworn peace officer" is someone "who is an employee of the federal government, the state, a political subdivision, agency, or department branch of a municipality, or other unit of local government, and has *law enforcement powers*." RCW 18.170.010(21) (emphasis added).[2] Thus, only sworn peace officers may exercise law enforcement

---

[1] *Romanski*, 428 F.3d at 637, concerned the public function test to determine whether a private party charged with deprivation of a constitutional right could be described as a state actor and therefore liable under 42 U.S.C. § 1983. There, casino security guards authorized under a Michigan statute to make arrests without warrants were found to be state actors because they were carrying out a public function. *Id.* at 638.

[2] Although private security was not specifically regulated until 1991, Washington law recognized law enforcement agencies and peace officers as only those employed by local, state, or federal

9

powers. *Id.* The legislature did not intend to authorize improvement districts to exercise police powers through law enforcement in RCW 35.87A.010(1)(f).

Nor does Seattle Ordinance 124175, the local legislation reestablishing Seattle's improvement area, authorize DBIA to exercise police power. Cities, like the State, may exercise police power and may delegate the performance of that power to private entities. WASH. CONST. art. XI, § 11; *Clarke*, 144 Wn. App. at 193. The ordinance lists "law enforcement" as one of the programs for which funds must be used. Seattle Ordinance 124175, § 5. Taken alone, this mandate appears to support Horvath's claim that DBIA is engaged in a governmental function. But we do not read statutory language in isolation.

We interpret ordinances like statutes according to the rules of statutory construction. *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007). In determining the plain meaning of an ordinance, we consider the language at issue and the context of the ordinance. *Id.*; *State v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). Seattle Ordinance 124175 requires funds to be used for law enforcement, but it also clarifies that the listed activity is "*supplemental*" to "law enforcement provided by the City and [is] not intended to displace any services regularly provided by municipal government." Seattle Ordinance 124175, § 5 (emphasis added). The ordinance itself distinguishes between law enforcement funded by revenues from the district and regular governmental law enforcement provided by the city of Seattle.

---

governments when RCW 35.87A.010 was amended in 1985. *E.g.*, former ch. 10.93 RCW (1985); LAWS OF 1985, ch. 89, § 2.

Setting this aside and assuming delegation of law enforcement authority, the ordinance does not explain *how* the district's program manager will exercise that power. Law enforcement is traditionally exercised by state and local government, regulated by state and local law. *E.g.*, SEATTLE MUNICIPAL CODE (SMC) 3.28.150-.220 (allowing the chief of police to issue special commissions to government employees or former police officers to assist the police department in enforcing laws). *See generally* SMC ch. 3.28 (police department regulations); RCW 10.93.070 (concerning the general authority of peace officers). The ordinance contains *no* cross-reference to any relevant authority. It does not elaborate on the type of law enforcement that is permitted. Nor does the ordinance *require* contracting for law enforcement services with the Seattle Police Department (SPD) or any other law enforcement agency.

Read in proper context, Seattle Ordinance 124175's reference to "law enforcement" does not show a legislative intent to delegate police power to DBIA. The enabling legislation makes this clear—the addition of "security" to RCW 35.87A.010(1) was intended to allow district revenues to fund *private security*. That DBIA contracts with SPD to provide this type of security does not transform it into a governmental function even when SPD performs law enforcement duties during security patrols.

Our PRA case law clarifies how a private entity can perform that type of governmental function. In *Clarke*, the Tri-Cities Animal Care & Control Shelter employed animal control officers whose duties included taking oaths to enforce the area's animal control regulations. 144 Wn. App. at 193. The shelter and its officers were

11

authorized to seize and destroy pets, and the officers were required to comply with "the same constitutional and statutory restrictions concerning the execution of police powers imposed on law enforcement." RCW 16.52.015(2). Because the local government granted the shelter the ability to execute police powers under state statute, the Court of Appeals held that the shelter performed a governmental function. *Clarke*, 144 Wn. App. at 193.

Unlike *Clarke*, no state or local authority permits DBIA to execute law enforcement duties. DBIA contracts with private security guards for on-site guarding, crowd management, and check-ins. They cannot enforce laws or ordinances. DBIA ambassadors are allowed to talk with unhoused persons about city ordinances preventing lying in door- and entryways, but the ambassadors cannot remove anyone or issue citations. *Id.* They cannot enforce laws or ordinances. DBIA also contracts with SPD to fund supplemental emphasis patrols. But when SPD enforces laws and ordinances on these patrols, it does so under the *city's* auspices. SPD officers remain city employees and the city (through the police chief) retains complete "direction, management and control" of the SPD officers. CP at 250, §§ 1.2, 1.4 ("Assignment of personnel to accomplice the supplemental police services requested . . . shall be at the sole discretion of the CITY's Police Chief or her designee."). Neither Horvath nor the majority provides any authority holding that *funding* supplemental police patrols constitutes a governmental function. Indeed, given that our case law imposes premises liability on business owners, businesses that choose to provide security for their customers would be government

agencies under the majority's analysis. *E.g.*, *Nivens v. 7-11 Hoagy's Corner*, 133 Wn.2d 192, 202-03, 943 P.2d 286 (1997) (holding that a special relationship exists between a business and an invitee and that business owners have a duty to keep their premises reasonably free from physically dangerous conditions where business invitees may be harmed by third persons). I would hold that DBIA does not engage in law enforcement activities as a police power nor is it exercising a delegated governmental power, thus it does not perform a governmental function.

Horvath and the majority also point to DBIA's sanitation services as an exercise of police power but do not discuss the enabling legislation or the nature of the service as *Fortgang* directs.[3] The provision references neighborhood revitalization, liveability, and decoration of public places. RCW 35.87A.010. The statute is silent, however, on sanitation. Section 5 of Seattle Ordinance 124175 states that revenues must be spent on "Clean Services" but does not define what those services entail. Exhibit B, the improvement district work plan, describes the cleaning services as neighborhood and alley cleanings, animal/human waste removal, graffiti removal, hypodermic needle disposal, sidewalk and gutter trash removal, sidewalk and storm drain leaf pickup,

---

[3] Horvath cites two cases in support: a Connecticut case recognizing sanitation as a traditional public service and a Washington case concerning whether a city may tax revenue received by a public utility district for the sale of domestic water within city limits. Pet'r's Suppl. Br. at 19-20 (citing *Domestic Violence Servs.*, 47 Conn. App. at 474; *City of Wenatchee v. Chelan County Pub. Util. Dist. No. 1*, 181 Wn. App. 326, 352-53, 325 P.3d 419 (2014) (Fearing, J., concurring)). The Connecticut case merely reaffirms that sanitation is a police power but does not elaborate on the nature of the activity. The Washington case is not relevant here, considering the entity providing the water was undisputedly public (a public utility district) while DBIA is undisputedly private. The case is also inapposite because the function at issue was a tax on the sale of domestic water. At issue here is the nature of DBIA's sanitation services.

sidewalk pressure washing, and trash can emptying. Similar to DBIA's provision of *supplemental* police patrols, Horvath and the majority do not identify any precedent holding *additional* sanitation services are an inherently governmental function. Again, if a business owner hires people to pick up trash or drug paraphernalia in front of their premises, they would be a government agency under the majority's analysis. *E.g.*, *Nivens*, 133 Wn.2d at 202-03. I would hold that DBIA's cleaning services are not equivalent to sanitation as a police power, and therefore this service is not a governmental function.

Nevertheless, even assuming that DBIA exercises police power via sanitation and law enforcement, the inquiry does not end here. *Telford* recognized that the governmental function analysis includes, where relevant, whether an entity has the power to make and implement decisions. 95 Wn. App. at 163; *Shavlik v. Dawson Place*, 11 Wn. App. 2d 250, 263, 452 P.3d 1241 (2019); *Domestic Violence Servs.*, 47 Conn. App. at 475.

*Shavlik* explored this factor and is instructive. In that case, a domestic violence nonprofit employed child interview specialists to conduct forensic interviews with child victims pursuant to a county contract. *Shavlik*, 11 Wn. App. 2d at 262. The interviews were used in criminal investigations and prosecutions, and specialists worked with prosecutors to develop cases. *Id.* The Court of Appeals held that this was not a governmental function because the nonprofit had "no control over investigatory and

charging decisions" and the police could conduct investigations without the nonprofit's assistance. *Id.* at 262-63.

Here, as in *Shavlik*, the city already provides sanitation and law enforcement to the improvement area without DBIA's assistance. DBIA provides, through contracting with partners, only supplemental street cleaning and funds additional SPD patrols. Seattle Ordinance 124175, Ex. B "(The MID intends to partner with the Millionair Club to deliver cleaning services in Belltown."). DBIA *ambassadors* clean up trash on streets, clear garbage or debris from sidewalks, and remove graffiti; DBIA does not repair streets or issue fines or citations relating to graffiti or have any control over the city's sanitation services. Moreover, also like *Shavlik*, DBIA has no authority to control SPD officers. DBIA cannot issue or enforce regulations. Its ambassadors and staff may conduct welfare checks and provide information on available services but cannot provide medical services or arrest individuals violating city ordinances. In short, DBIA has no power to *govern*, *regulate*, or *make decisions* affecting government. *See Shavlik*, 11 Wn. App. 2d at 263. Thus, the first *Telford* factor weighs against holding DBIA to be a public entity.

The majority holds otherwise. Majority at 13, 15. It lists police powers such as public safety and sanitation and concludes that, because DBIA provides at least *some* those services, it provides core governmental functions. *Id.* at 15. But the majority does

not pair this broad conclusion with any discussion of the actual "nature" of DBIA's

activities as an exercise of police power.[4]  *Fortgang*, 187 Wn.2d at 525-26.

Nor does the majority explain how a private entity like DBIA *can* exercise police

power—an authority that only government possesses. *Manufactured Hous. Cmtys. of*

*Wash. v. State*, 142 Wn.2d 347, 354, 13 P.3d 183 (2000) (plurality opinion) ("Police

power is inherent in the *state* by virtue of its granted sovereignty." (emphasis added)),

*overruled in part on other grounds by Chong Yim*, 194 Wn.2d 651, 451 P.3d 675 (2019);

*Ventenbergs*, 163 Wn.2d at 100 (Local governments have the "power to enact and

enforce police and sanitary regulations." (citing WASH. CONST. art. XI, § 11)).

Under the majority's holding, all that is required for an entity to perform a

governmental function is to provide a service supporting public health and safety (the

police power), without an analysis of whether there is authority delegating that power or

the nature of the service that is authorized or performed.  *See* majority at 13-15.  This rule

will create unintended and problematic consequences for private entities engaging with

government.

For example, large events such as concerts held at Seattle stadiums, the Capitol

Hill Block Party, Seafair, and the Seattle Pride Parade must have public safety

management plans requiring SPD presence as well as emergency medical and fire

services.  *See* Public Safety and Event Management, CITY OF SEATTLE,

---

[4] The majority reviews PRA cases that identified governmental functions, but the relevance of those cases is vague considering the majority does not connect them to the issue presented here. Majority at 14 (citing *Telford*, 95 Wn. App. 163-64, *Cedar Grove*, 188 Wn. App. at 719, and *Clarke*, 144 Wn. App. at 194).

https://www.seattle.gov/special-events/public-safety/public-safety-and-event-

management#largeevents1000ormoreattendees.  The Seafair Foundation or Seattle Pride,

both 501(c)(3) nonprofit foundations, have worked with SPD for additional security

services and road closures for events.  *Seafair Weekend Festival Neighborhood Passes*,

SEAFAIR, https://www.seafair.org/neighborhood/ [https://perma.cc/58VE-3A7A]; *Seattle*

*Pride Statement on Police Involvement at the Seattle Pride Parade*, SEATTLE PRIDE,

https://seattlepride.org/news/seattle-pride-statement-on-police-involvement-at-the-seattle-

pride-parade [https://perma.cc/U85Y-79SY].  Under the majority's holding, Seafair's and

Seattle Pride's contracts with SPD for additional security services constitute an inherently

governmental function.  This result makes little sense considering *Telford*'s purpose is to

identify entities effectively stepping into the shoes of government and "not . . . erod[ing]

the privacy of any entity contract[ing] with government to further the public interest."

*Fortgang*, 187 Wn.2d at 526.  The governmental function factor was not intended to be

limitless, turning any private entity that engages with a city's police power by contracting

for supplemental services into a governmental agency.

        2.      Government Funding

        The more public funding an agency receives, the more likely this factor is

satisfied.  *Id.* at 529.  DBIA is almost entirely funded by district revenues.  The majority

concludes that DBIA's 93 percent public funding weighs "heavily" in favor of finding

DBIA is functionally equivalent to a government agency.  Majority at 15-16.  I disagree.

Generally, Washington and out-of-state cases focus on the percentage of funding attributable to public sources. *Fortgang*, 187 Wn.2d at 528-29. Foreign cases have also looked beyond percentage and considered the nature of the funding scheme. *Id*. at 528. *Fortgang* noted that a funding scheme weighs in favor of functional equivalency when it is a fixed allocation, such as designated levy funds, but a fee-for-service model weighs against functional equivalence "even where an entity receives all or most of its funding from public sources." *Id.*

This court has also stated that our PRA cases "*suggest*" that the percentage of public funding is the "foremost consideration when applying [this] factor." *Id.* at 529 (emphasis added) (citing *Cedar Grove*, 188 Wn. App. at 720; *Clarke*, 144 Wn. App. at 194-95; *Telford*, 95 Wn. App. at 164). But none of the cited cases examined the percentage of public funding. Out-of-state cases have recognized that "a substantial amount of government funding is also not sufficient to render that entity a public agency." *Dow v. Caribou Chamber of Com. & Indus.*, 2005 ME 113, ¶ 15, 884 A.2d 667, 671; *Frederick v. City of Falls City*, 289 Neb. 864, 878, 857 N.W.2d 569 (2015); *State ex rel. Oriana House, Inc. v. Montgomery*, 110 Ohio St. 3d 456, 463, 2006-Ohio-4854, ¶ 29, 854 N.E.2d 193 (citing *Irwin Mem. Blood Bank of S.F. Med. Soc'y v. Am. Nat'l Red Cross*, 640 F.2d 1051, 1056-57 (9th Cir. 1981) (receipt of money from government contracts did not make the Red Cross an agency subject to the Freedom of Information Act, absent substantial federal control or supervision of its operations)). The Maine Supreme Court reasoned that even substantial government funding is insufficient

under this factor because, if so, "any private organization that received grant money" could be deemed a public agency. *Dow*, 2005 ME 113, ¶ 15, 884 A.2d at 671.

Further, as DBIA argues, the funding method here is unique. Resp't DBIA Servs.' Suppl. Br. at 27-29 (quoting *McMillan v. Tacoma*, 26 Wash. 358, 361-62, 67 P. 68 (1901) (recognizing the "'entirely distinct'" theories of general taxation and special assessments)). The nature of the MID revenues *must* be spent on purposes identified in the ordinance (or initiation petition) and can be used only to benefit the assessment area. *Id*. at 28-29 (citing RCW 35.87A.120; *Rogers Clothing for Men*, 114 Wn.2d at 227-28 (assessments benefit property within the improvement area)). This funding method is distinct from general tax or levy dollars at issue in previous *Telford* cases.

Here, the nature of DBIA's funding reflects a fee-for-service model. The city of Seattle pays out assessment funds as DBIA submits invoices. Seattle cannot legally spend the special assessment funds for any other purpose except those identified in the initiation petition or ordinance. *Horvath*, 31 Wn. App. 2d at 571 n.18. This model weighs against the second *Telford* factor. *Fortgang*, 187 Wn.2d at 529 ("[T]he type of funding matters and, specifically, . . . an ordinary fee-for-service model typically weighs against functional equivalency"). The nature of the funding is unique when compared with prior *Telford* cases. And finally, I share the concern identified by the Maine Supreme Court that any entity that receives public funds, such as a grant or contracting with a government, could be deemed a public agency. For these reasons, I would hold that this factor weighs against functional equivalence.

19

3.      Government Control/Involvement

I agree with the majority that the city of Seattle is not involved in the daily operations of DBIA, and this factor weighs *against* concluding DBIA is functionally equivalent to a government agency.  Majority at 16.

4.      Entity's Origin/Government Creation

The majority is correct that the government did not create DBIA.  *Id.* at 16-17. DBIA is a private, nonprofit corporation administering the MID.  This factor weighs against functional equivalency for DBIA.  The majority agrees.  *Id.*  I would leave it at that.

The majority does not.  Instead, the majority turns to the purpose of the *Telford* test—whether immunity from the PRA would frustrate government transparency—to accept Horvath's claim that we should treat DBIA and improvement district as a single entity.  *Id.*  Consequently, the majority turns the purpose of the test into a new factor and then weighs this factor in favor of concluding DBIA's records are public given the government's control and creation of the *MID*, and because DBIA has held itself out as the MID.  *Id.*

It is puzzling why the majority chooses this factor to examine DBIA and the MID together when it examined DBIA alone for every preceding factor.  *See* majority at 13-16. Even if DBIA at times described itself as doing business as the MID or as the MID in communications, that does not transform it into a government entity.  *E.g.*, *Graham v. State Bar Ass'n*, 86 Wn.2d 624, 626, 548 P.2d 310 (1976) (acknowledging that reference

to an entity as an agency for one purpose does not control for all purposes). Like the majority did for the first three *Telford* factors, I would continue analyzing DBIA as a single entity.

  5.      Balancing of Factors

Unlike the majority, I would conclude that on balance the *Telford* factors weigh against PRA coverage. For the first factor, DBIA does not provide a core governmental function. Neither state legislation nor local ordinance delegates any police power to DBIA. At most, DBIA supplements what are generally recognized as governmental functions by contracting with SPD for additional patrols[5] and sanitation services through contracts with private entities—both of which the city itself provides. Most importantly, DBIA has *no* authority to control SPD officers or city-provided sanitation.

The remaining factors weigh against functional equivalency. DBIA receives substantial public funding, but the nature of the scheme is a fee-for-service model. The city of Seattle has some involvement with DBIA but exercises no meaningful control over DBIA's daily operations.[6] Though the improvement district was enacted through

---

[5] Many private entities contract for extra police services, including sporting events, parades, and rallies to name a few, illustrating again the far reach of the majority's analysis.

[6] Under the majority's approach, entities contracting with municipalities like Seattle will likely be required to disclose information that the city is able to provide. In this case, the Office of Economic Development provided almost all the requested records except DBIA staff compensation. Now, private entities will likely be discouraged from contracting with Seattle (and other municipalities with PBIAs) if their internal personnel records revealing salaries, vacation, sick leave pay, and training records are available to the public. *See DeLong v. Parmelee*, 157 Wn. App. 119, 161-62, 236 P.3d 936 (2010).

ordinance, it was first initiated via citizen initiative and the government was not involved in DBIA's creation.

As in *Fortgang*, the relationship between the city of Seattle and DBIA does not implicate *Telford*'s central concern: identifying private entities that have effectively *assumed the role of the government*.  187 Wn.2d at 526.  Rather, DBIA is a private entity contracting with the government to provide services in support of economic development and neighborhood revitalization.  RCW 35.87A.010(1).  I would therefore affirm the trial court's ruling that DBIA is not an "agency" subject to the PRA.

With these considerations in mind, I respectfully dissent.

_____
Madsen, J.